**UNITED STATES of America**

v.

**James BERNETT, also known as James Barnett, Appellant.**

**No. 71–1465.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 15, 1972.

Decided Jan. 10, 1974.

Rehearing Denied March 20, 1974.

Spottswood W. Robinson, III, Circuit Judge, dissented in part in Section III of the opinion.

Bazelon, Chief Judge, and J. Skelly Wright and Spottswood W. Robinson, III, Circuit Judges, would grant rehearing en banc, limited to voluntariness issue discussed in Part III of Judge Robinson's opinion.

Leventhal, Circuit Judge, filed statement of his reasons for voting to deny rehearing.

James M. Kefauver, Washington, D. C. (appointed by this Court) for appellant.

James F. Flanagan, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry, and John Ellsworth Stein, Asst. U. S. Attys., at the time the brief was filed, were on the brief, for appellee. Thomas A. Flannery, U. S. Atty. at the time the record was filed, also entered an appearance for appellee.

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. Bernett was indicted for murder in the second degree, a violation of D.C. Code § 22–

Before ROBINSON and WILKEY, Circuit Judges, and JAMESON,* Senior United States District Judge for the District of Montana.

PER CURIAM:

Judge Robinson files an opinion in Parts I, II, IV and V of which Judge Wilkey and Judge Jameson concur. Judge Wilkey files an opinion in which Judge Jameson concurs, Judge Robinson dissenting for the reasons stated in Part III of his opinion. Thus Parts I, II, IV and V of Judge Robinson's opinion and Judge Wilkey's opinion together constitute the opinion of the court. The judgment of conviction appealed from is

Affirmed.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal is taken by James Bernett from his conviction of manslaughter [1] following a two-day trial. It raises two claims of error stemming from the District Court's denial of a motion to suppress, on grounds of involuntariness, an inculpatory oral admission which Bernett made to the police immediately prior to his arrest. The first is that the court's consideration of the voluntariness issue did not adequately safeguard Bernett's due process rights. The second is that even if the admission were voluntary, the failure of the court to charge the jury concerning the weight that might be given to it amounted to reversible error.

As to Bernett's first contention, my colleagues conclude that the admission was made in a noncustodial setting and was, for that reason, voluntary. That position is set forth in Judge Wilkey's opinion and is, of course, this court's decision on that phase of the appeal. My own examination of the record compels me to conclude that in evaluating the challenged statement, the District Court

2403 (1967). He was found guilty of manslaughter, see D.C. Code § 22–2405 (1967), a lesser included offense. See cases cited infra note 12.

fell short of the requirement of Sims v. Georgia [2] that determinations favorable to voluntariness appear "with unmistakable clarity;" [3] and since I am uncertain as to how the District Court resolved facts bearing critically on the issue, I would remand the case for explicit findings on the voluntariness of the questioned admission, and for a new trial in the event that it is found to have been involuntarily made.[4] As to Bernett's second contention, we conclude unanimously that the omission of the instruction was error but that, viewed in context, the error was nonprejudicial.[5]

My opinion is in five sections. Part I presents a summary of the evidence introduced at trial, including the circumstances surrounding the admission under attack. Part II reviews the pretrial suppression hearing on the voluntariness issue. Part III addresses the voluntariness issue, and is a dissenting view to the court's position. In Part III I outline the relevant case law, explain how I think it should have borne on the voluntariness determination, and discuss the Government's charge that the error complained of in that regard was harmless. Part IV treats the court's failure to charge the jury on the weight it could accord the admission, and expresses our unanimous decision. Part V summarizes the court's holdings.

## I. FACTUAL BACKGROUND

Despite gaps and contradictions in the testimony adduced by the parties at trial, the basic facts as to what occurred on the day of the crime can be reconstructed and summarized. The victim of the homicide of which Bernett was found guilty was one Theodore Nixon, who with Bernett, the latter's common-law wife, Harriet Smith, and Ben O.

Smith (no relation to Harriet Smith) shared a basement apartment at 1441 Euclid Street, Northwest, in the District of Columbia. On the morning of the homicide, the four awoke and began drinking, continuing until they had consumed their available supply of alcohol. Around noon they retired to sleep off the effects of the drinking. Nixon and Ben Smith slept on couches in the living room; Bernett and Ms. Smith went to the bedroom they shared in the back of the apartment. Some time later Bernett left the apartment and when he returned he assumed his role in the fatal episode.

At trial, Bernett gave the jury his version of what occurred.[6] When he got back to the apartment, he discovered Nixon sitting on his couch beside Ms. Smith, his hand underneath her dress. Bernett became angry and argued with her; she came after him with a bed slat, which he took away from her, and then with a knife. He slapped her and she dropped the knife and ran out of the apartment.

Thereupon, Bernett turned his attention to Nixon, whom he accused first of stealing some of his money the week before, and then of stealing his wife. A quarrel ensued and as Bernett turned and walked over toward the couch where Ben Smith was still asleep, Nixon, who was in a thigh-high cast because of a broken leg, hit him with one of his crutches.[7] Bernett grabbed a nearby ashtray stand and struck Nixon with it. He then returned to Ben Smith's sofa, wakened Smith, borrowed five dollars from him and left the apartment.

Ben Smith testified that Bernett had borrowed the five dollars before the four went to sleep, and that he did not wake up until about 4:00 o'clock in the afternoon when Roscoe Moore, a friend,

---

2. 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967).

3. *Id.* at 544, 87 S.Ct. 639.

4. See Parts III, V, *infra.*

5. See Part IV, *infra.*

6. As will appear, this version was contradicted in several respects by direct testimony

and circumstantial evidence presented at the trial.

7. Because of the cast, Nixon could move around only with great difficulty. There was testimony that, after the homicide his crutches were found leaning against a wall in the kitchen.

shook him and asked him for some wine. Smith called to Nixon but received no reply; observing blood on the latter's face, Smith summoned an ambulance and the police. Upon their arrival the police discovered that Nixon was dead, and the coroner's report subsequently revealed that he died from a skull fracture, apparently the result of being struck with the ashtray stand, which lay broken near the couch where the body was found. Smith stated that Ms. Smith was present when he was awakened by Moore and that she had a bruise on her face.

After leaving the apartment following his fight with the deceased, Bernett went to a club where he spent the next two hours drinking. He was found there around 6:00 o'clock by his nephew's wife, Eartha L. Clark, and his sister, Josephine Battles. Ms. Clark told Bernett that the police were looking for him in connection with a homicide on Euclid Street, and tried to talk him into turning himself in. After drinking another glass of whiskey, he agreed to accompany the two women to Ms. Clark's apartment.

Between 7:00 o'clock and midnight Bernett remained at the apartment, drinking the entire time, for, in the words of Ms. Clark, "we had to give him a lot of whiskey to keep him there, because otherwise he was going to leave." According to Ms. Clark, Bernett gave them essentially the same version of his altercation with the deceased that he later advanced at trial.[8] Ms. Clark had called the police shortly after bringing Bernett to her apartment, but there was no response until around midnight when Metropolitan Police Officer Ronald L. Schleig arrived after receiving a radiocast to investigate.

Officer Schleig was met by Ms. Clark outside her apartment, and she explained to him that a man inside was wanted for homicide. The officer accompanied Ms. Clark and she pointed out Bernett, who was seated on the sofa. When asked his name, Bernett blurted out "Jimmy Bernett. I know the police are looking for me. I killed a man at 1441 Euclid Street."[9] Officer Schleig testified that at the time Bernett was drunk and that his speech was slurred.

Bernett accepted the officer's invitation to accompany him to the stationhouse, and during the ride he continued to drink from a bottle of whiskey he had taken along. Once in his patrol car, Officer Schleig radioed headquarters to ascertain whether a homicide had occurred that day in the 1400 block of Euclid Street, and whether the police sought a man named Jimmy Bernett. When he received affirmative replies to both inquiries, he pulled the car over to the side of the street and gave Bernett the *Miranda* warnings.[10]

The warnings were repeated to Bernett by Officer Louis B. Richardson at the stationhouse. After signing a "consent" form, Bernett gave an oral statement to Officer Richardson, but when it was transcribed he refused to sign it. Officer Richardson testified that at the time these events took place, Bernett was drunk.

Bernett was subsequently indicted for murder in the second-degree,[11] and he requested a jury trial. Prior to trial his counsel moved to suppress both his admission to Officer Schleig at the apartment, and the statement to Officer Richardson at the stationhouse. The District Court denied the motion as to the first, and granted it as to the second. After four hours of deliberation, the

---

8. See note 15, *infra*.

9. On cross-examination at the pretrial suppression hearing, Officer Schleig recalled that Bernett also admitted that he struck Nixon twice in the head. This more detailed version of Bernett's statement was repeated by Officer Schleig at trial. See text *infra* at note 107. Ms. Clark's account of Bernett's

comment to the policeman and Bernett's own recollection of it varied somewhat from Officer Schleig's version. See text *infra* at note 108.

10. See Miranda v. Arizona, 384 U.S. 436, 467–473, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

11. D.C. Code § 22–2403 (1967).

jury returned a verdict of guilty on the lesser-included offense of manslaughter,[12] and Bernett was sentenced to imprisonment for five to fifteen years.[13] This appeal followed.

## II. THE PRETRIAL SUPPRESSION HEARING

█ As we earlier indicated, Bernett's trial attorney [14] made a pretrial challenge to the admissibility of the statements made respectively to Officers Schleig and Richardson, asserting that these two admissions [15] were involuntary and were given in violation of Miranda v. Arizona.[16] While the transcript of the suppression hearing reflects a conscientious effort by the District Court to marshal and resolve the facts concerning the incriminating utterances, it nevertheless appears that the court's inquiry was limited to factors relevant to the Miranda problem, and that it gave almost no consideration to the question of voluntariness apart from its Miranda aspects.

First, Officer Schleig testified to the statement Bernett made to him, and said that without doubt Bernett was very intoxicated at the time. Although he spoke in a normal tone, his speech was slurred and, according to the officer, when Bernett volunteered the comment concerning his part in the Euclid Street homicide, Officer Schleig "really didn't believe what was going on because [Bernett] was drunk. I thought he was an ordinary drunk just more or less running off at the mouth." Officer Schleig also testified that Bernett was still drinking in the scout car on the way to the stationhouse.

Next, Officer Richardson testified to events which transpired at the stationhouse approximately half an hour after Bernett and Officer Schleig departed Ms. Clark's apartment. By Officer Richardson's estimate, Bernett had been drinking a lot and was drunk when he signed the Miranda waiver. The officer stated that Bernett had a half-pint bottle of liquor with him when he arrived, but that only a portion of it had previously been consumed.

In argument following the policemen's testimony, the Government claimed that the first admission—to Officer Schleig—was made in a noncustodial setting, and that the second—to Officer Richardson—was given after a willing and intelligent waiver of Miranda rights. Bernett's counsel disputed both contentions. The District Court declined to suppress Bernett's admission to Officer Schleig but held that the one to Officer Richardson must be excluded.

In elaborating on the basis for its rulings, the court explained that when confronted with Bernett's intoxicated condition, police at the stationhouse were under a duty to do more than perfunctorily read him PD Form 47 [17] and obtain his signed waiver to properly discharge their responsibility of assuring that he fully understood his constitutional safeguards and knowingly rejected them. Counsel for

12. See United States v. Dixon, 135 U.S.App. D.C. 401, 419 F.2d 288 (1969); Austin v. United States, 127 U.S.App.D.C. 180, 188, 382 F.2d 129, 137 (1967); United States v. Edmonds, 63 F.Supp. 968, 970 (D.D.C.1946).

13. See D.C. Code § 22–2405 (1967).

14. Not his counsel on appeal.

15. No challenge was made by trial counsel to the voluntariness of Bernett's account to Ms. Clark and Ms. Battles nor is an issue regarding it sought to be raised here. This is fully understandable, for while the record discloses that Bernett was highly intoxicated at the time of his admission to Officer Schleig, it does not portray that condition when, five hours earlier and prior to a con-

siderable amount of additional drinking, Bernett first discussed the homicide with the two women. We note in passing, however, that his statements to them were not immune to a voluntariness attack simply because they were not made to a law enforcement official. See United States v. Robinson, 142 U.S.App.D.C. 43, 51 n. 8, 439 F.2d 553, 561 n. 8 (1970), and cases there cited. See also Part III(A), infra.

16. Supra note 10.

17. Metropolitan Police Department Form PD–47 summarizes the warnings to be given an accused person in custody as required by Miranda v. Arizona, supra note 10, 384 U.S. at 444–445, 86 S.Ct. 1602.

the Government then pressed the court to rule whether the second statement might still be used, under the doctrine of Harris v. New York,[18] to impeach Bernett at trial. *Harris* permits that use of confessions found to be voluntary even where the waiver of *Miranda* rights is for some reason found to be defective.[19] Bernett's attorney contended the statement at the stationhouse was in no way voluntary, and the court agreed, holding that it could not be utilized for impeachment.

Defense counsel then inquired whether the court's determination on the admissibility of the first statement—the ruling under attack here—was based on the fact that his client was not in custody when he made it at Ms. Clark's apartment. The court responded in the affirmative, and concluded the suppression hearing. From this it appears that the court's only finding on voluntariness aside from *Miranda* considerations was with respect to Bernett's divulgences at the stationhouse—the determination made after the Government raised its point on Harris v. New York.[20] As to Bernett's earlier remarks to Officer Schleig, the court's inquiry stopped short with its conclusion that the situation was noncustodial and, accordingly, that warnings were not required.

### III. VOLUNTARINESS OF THE CHALLENGED ADMISSION

Given the District Court's ruling that, owing to Bernett's intoxication, his sec-

ond statement—made half an hour after the first—was involuntary, and given also the substantially identical testimony by the two police officers regarding Bernett's drunken condition at the apartment and the stationhouse, I am troubled by the absence of any finding as to the voluntariness of the first statement. But more importantly still, I believe the court's failure to rule explicitly on the voluntariness of the admission challenged here conflicts with the procedural requirements established by the relevant case law. Consequently, I would remand the case to the District Court for an express determination as to whether Bernett was or was not so intoxicated that the first statement was in fact involuntary. My colleagues disagree, however, and the action of the court is affirmance of the District Court's ruling. My own views follow.

### A. The Relationship Between Miranda and Voluntariness Issues Generally

I can well understand the District Court's preoccupation with questions of custody, warnings and waiver in conducting the voluntariness hearing, since the Supreme Court's decision in Miranda v. Arizona [21] has virtually dominated this area of the law since 1966. As a practical matter, the great bulk of confessions and incriminating admissions [22] sought to be suppressed are made to law enforcement officers by accused persons while in custody, and in such situations

---

18. 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

19. *Id.* at 226, 91 S.Ct. 643.

20. See text *supra* at notes 18–19.

21. *Supra* note 10.

22. The distinction between admissions and confessions is pointed out in Jones v. United States, 111 U.S.App.D.C. 276, 280, 296 F.2d 398, 402 (1961), cert. denied, 370 U.S. 913, 82 S.Ct. 1260, 8 L.Ed.2d 406 (1962):
> Confessions are admissions of the crime itself. Admissions, so-called, concern only some specific fact which, in turn, tends to establish guilt or some element of the offense.

See also Opper v. United States, 348 U.S. 84, 91 n. 7, 75 S.Ct. 158, 99 L.Ed. 101 (1954). It is immaterial whether Bernett's statement to Officer Schleig is viewed as a confession or as an admission, for the standards governing its voluntariness and admissibility are the same. See Miranda v. Arizona, *supra* note 10, 384 U.S. at 476, 86 S.Ct. 1602; Jones v. United States, *supra*, 111 U.S.App. D.C. at 280, 296 F.2d at 402; Gladden v. Unsworth, 396 F.2d 373, 375–376 (9th Cir. 1968). We note, too, that the federal statute which now deals with the admissibility of confessions embraces "any self-incriminating statement." Omnibus Crime Control and Safe Streets Act of 1968, Pub.L.No.90–351, tit. II, § 701(a), 82 Stat. 210, 18 U.S.C. § 3501(e) (1970), quoted *infra* at note 89.

*Miranda* has established the threshold inquiries prerequisite to a determination of admissibility. Once in custody, the accused must be advised of his constitutional privilege against self-incrimination and his right to the assistance of counsel.[23] He must be warned that anything he says can be used in the prosecution against him, and, if he elects to speak anyway, his statements are admissible only upon a showing that he understood these rights and knowingly and intelligently waived them.[24]

Pervasive though its influence has been, *Miranda* cannot be said to have set all prior case law on the subject of voluntariness for naught. On the contrary, there remain situations where the prior law is still relevant and applicable,[25] as the case before us illustrates. Not every inculpatory pronouncement is made while the declarant is in police custody or is "otherwise deprived of . . . freedom of action in any significant way."[26] Nor is every guilty disclosure made in response to questioning by law enforcement personnel.[27] Apparent compliance with the *Miranda* procedures does not automatically assure the voluntariness of a statement,[28] any more than failure to adhere to *Miranda* automatically renders an admission involuntary.[29]

The focal point of any investigation into the voluntariness of an utterance is the mind of the declarant, and the critical inquiry is whether or not in the totality of the circumstances the assertion is the product of a rational intellect and a free will.[30] The rationale behind outlawry of convictions based in whole or in part on involuntary incriminating declarations rests not merely on their probable unreliability,[31] but even more importantly on the basic premise that our legal system does not permit an advantage to be taken of a person lacking the power to make an intelligent choice.[32]

Thus it can be readily seen that an inquiry into *Miranda* issues is not coextensive with an investigation of voluntariness generally. If the accused's powers of reason and volition are impaired, the question whether he was in custody when he spoke is irrelevant. And even the most patient and thorough explanation of constitutional rights will not make admissible the confession of one whose mental faculties are so blunted by alcohol, drugs or insanity that he cannot be said to have given it voluntarily with understanding. The *Miranda* requirements are a means of insuring within the limited ambit of custodial questioning that accused persons will be fully informed of their rights, and will knowingly and intelligently choose to relinquish them before making statements

23. Miranda v. Arizona, *supra* note 10, 384 U.S. at 444, 86 S.Ct. 1602, 1612.

24. *Id.*

25. Davis v. North Carolina, 384 U.S. 737, 740, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); Johnson v. New Jersey, 384 U.S. 719, 730, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

26. *Id.*

27. See, *e. g.*, United States v. Robinson, *supra* note 15, 142 U.S.App.D.C. at 47–48, 51 & n. 8, 439 F.2d at 557–558, 561 & n. 8; Eisen v. Picard, 452 F.2d 860, 862 (1st Cir. 1971), cert. denied, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972); Gilpin v. United States, 415 F.2d 638, 639–640 (5th Cir. 1969); Gladden v. Unsworth, *supra* note 22, 396 F.2d at 379.

28. Thus, in the case at bar, the District Court rejected the contention of the Government that repetition of *Miranda* warnings to

Bernett and obtaining his consent to speak while at the stationhouse sufficed to show that the statement made there to Officer Richardson was voluntary. See, *e. g.*, United States v. Robinson, *supra* note 15, 142 U.S. App.D.C. at 52, 439 F.2d at 562; Gilpin v. United States, *supra* note 27, 415 F.2d at 642; United States v. Guaydacan, 470 F.2d 1173, 1174 (9th Cir. 1972).

29. See Harris v. New York, *supra* note 18, 401 U.S. at 224, 91 S.Ct. 643.

30. Blackburn v. Alabama, 361 U.S. 199, 206, 208, 80 S.Ct. 274, 8 L.Ed.2d 242 (1960); Fikes v. Alabama, 352 U.S. 191, 197, 77 S. Ct. 281, 1 L.Ed.2d 246 (1957).

31. Rogers v. Richmond, 365 U.S. 534, 540–541, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

32. Blackburn v. Alabama, *supra* note 30, 361 U.S. at 207, 80 S.Ct. 274.

**950**

of a self-incriminating nature. The issue of voluntariness is raised in a more fundamental way where the court's attention is called to facts suggesting that the accused's admissions, whether oral or written, were not the products of a rational intellect and a free will. When a substantial challenge is presented on this issue, the appropriate response is a searching judicial examination which summons all the relevant facts, evaluates them with care, and articulates findings precisely and fully.[33] I believe that Bernett's involuntariness claim was of a character to call for that treatment by the District Court.

B. *The Voluntariness Problem*

At the pretrial suppression hearing, Officer Schleig described Bernett as unquestionably intoxicated when the officer responded to Ms. Clark's call. Indeed, when Bernett began speaking, Officer Schleig was prepared to dismiss his remarks as those of "an ordinary drunk just more or less running off at the mouth." The explanation for Bernett's inebriated condition was provided by Ms. Clark, who revealed at trial that in order to persuade him to remain at her apartment, it was necessary to ply him with whiskey for five hours until the police arrived. Moreover, Bernett said he had been imbibing at a club before he was found by Ms. Clark and, according to Ben Smith, he had also participated in a round of drinking at the Euclid Street apartment that morning.

Thus, the record yields substantial evidence that Bernett was very inebriated when he confessed his involvement in the homicide to Officer Schleig.

That alcohol consumption may reach such a level as to impair the voluntariness of an incriminating confession has been settled law in this jurisdiction for some time. While our early cases spoke in terms of drunkenness which "goes to the extent of mania," [34] that quaint phraseology reflected a judgment about the impact of intoxicants on the human psyche which has retained its validity over the years. Alcohol, like drugs and mental disease, has the potential to so numb the consciousness that a statement made by a person thus affected cannot be said to be "the product of any meaningful act of volition." [35] And where extreme intoxication presents an issue as to the voluntariness of the accused's statements, the cases make clear that due process requires careful judicial scrutiny of the matter.

C. *Voluntariness: What Does It Mean?*

"The ultimate test" of admissibility of confessions, said Justice Frankfurter, "remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness." [36] So, too, it is the test levied by the Due Process Clauses of the Fifth and Fourteenth Amendments.[37] The initial step, then,

33. See Part III(G), *infra*.

34. Mergner v. United States, 79 U.S.App.D.C. 373, 147 F.2d 572, cert. denied, 325 U.S. 850, 65 S.Ct. 1085, 89 L.Ed. 1971 (1945); McAffee v. United States, 72 App.D.C. 60, 65, 111 F.2d 199, 204, cert. denied, 310 U.S. 643, 60 S.Ct. 1094, 84 L.Ed. 1410 (1940); Bell v. United States, 60 App.D.C. 76, 77, 47 F.2d 438, 439 (1931).

35. Blackburn v. Alabama, *supra* note 30, 361 U.S. at 211, 80 S.Ct. at 282. See also Unsworth v. Gladden, 261 F.Supp. 897, 902 (D.Or.1966).

36. Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). But see, note 37, *infra*.

37. Admissibility of an accused's incriminating statements in federal courts have long been tested, not only by common law rules, *e. g.* Wilson v. United States, 162 U.S. 613, 621–623, 16 S.Ct. 895, 40 L.Ed. 1090 (1896); Pierce v. United States, 160 U.S. 355, 357, 16 S.Ct. 321, 40 L.Ed. 454 (1896), but also by the Self-Incriminating Clause of the Fifth Amendment. *E. g.*, Burdeau v. McDowell, 256 U.S. 465, 474–475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); Bram v. United States, 168 U.S. 532, 542, 18 S.Ct. 183, 42 L.Ed. 568 (1897). Constitutional protection against use of involuntary confessions in state trials was derived from the Due Process Clause of the Fourteenth Amendment in 1936, Brown v. Mississippi, 297 U.S. 278, 285–287, 56 S.Ct. 461, 80 L.Ed. 682 (1936),

must be to ascertain, as precisely as possible, just what is embraced within the term "voluntary" when employed in the constitutional sense.

The meaning of the term is neither simple, single nor exact.[38] It is, rather, legal shorthand for a complex of values. Perhaps the most succinct, yet the most comprehensive, articulation of these values is found in Blackburn v. Alabama.[39] Dissecting the pertinent passage from the Supreme Court's decision in that case,[40] one can enumerate interests protected by exclusion of involuntary confessions from use in criminal prosecutions. One is the interest in trustworthy evidence.[41] Another is preservation of individual "freedom of will" and "rational choice." [42] Still an-

and for nearly three decades in numerous decisions thereafter. *E. g.*, Rogers v. Richmond, *supra* note 31, 365 U.S. at 504, 81 S. Ct. 735; Spano v. New York, 360 U.S. 315, 324, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); Payne v. Arkansas, 356 U.S. 560, 561, 78 S. Ct. 844, 2 L.Ed.2d 975 (1958); Fikes v. Alabama, *supra* note 30, 352 U.S. at 197, 77 S.Ct. 281; Chambers v. Florida, 309 U.S. 227, 238, 60 S.Ct. 472, 84 L.Ed. 716 (1940); Brown v. Mississippi, *supra*, 297 U.S. at 286–287, 56 S.Ct. 461. In 1964, it was flatly held, in Malloy v. Hogan, 378 U.S. 1, 6–9, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), that additional protection was afforded by inclusions within due process of the privilege against self-incrimination at the hand of the states. And see Miranda v. Arizona, *supra* note 10, 384 U.S. at 458–466, 86 S.Ct. 1602. But even with *Malloy*, it continued to be "axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession. . . ." Jackson v. Denno, 378 U.S. 368, 376, 84 S. Ct. 1774, 1780, 12 L.Ed.2d 908 (1964).

It cannot be doubted that the Due Process Clause of the Fifth Amendment safeguards against all that its counterpart in the Fourteenth bans. Bolling v. Sharpe, 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Bowles v. Willingham, 321 U.S. 503, 518, 64 S.Ct. 641, 88 L.Ed. 892 (1941); Agnello v. United States, 269 U.S. 20, 33–34, 46 S.Ct. 4, 70 L.Ed. 145 (1925). This is not to suggest, however, that the Due Process and Self-Incrimination Clauses stake out the same boundaries. *Cf.* 8 Wigmore, Evidence § 2266 at 401 (McNaughton rev. 1961). For one thing, the latter is directed specifically against compelled testimonial disclosure, and the former more broadly against fundamentally unfair trials. I do say, however, that one accused of crime is at liberty to draw upon them both. And it is to be remembered that however one may feel about the circumstances surrounding the utterance in issue in the case at bar, the Government made full use of it at Bernett's trial.

38. See, *e. g.*, Culombe v. Connecticut, *supra* note 36, 367 U.S. at 604–605, 81 S.Ct. 1860; Miranda v. Arizona, *supra* note 10, 384 U.S. at 507–510, 86 S.Ct. 1602 (dissenting opinion of Justice Harlan). See also Schneckloth v. Bustamonte, 412 U.S. 218, 223–227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

39. *Supra* note 30.

40. The Court said:
[N]either the likelihood that the confession is untrue nor the preservation of the individual's freedom of will is the sole interest at stake. As we said just last Term, "The abhorrence of society to the use of involuntary confessions . . . also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." Spano v. New York, *supra* [note 37, 360 U.S.] at 320–321 [79 S.Ct. 1202, at pages 1205, 1206, 3 L.Ed. 1265]. Thus a complex of values underlies the stricture against use by the state of confessions which, by way of convenient shorthand, this Court terms involuntary, and the role played by each in any situation varies according to the particular circumstances of the case.
In the case at bar, the evidence indisputably establishes the strongest probability that Blackburn was insane and incompetent at the time he allegedly confessed. Surely in the present stage of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane; and this judgment can without difficulty be articulated in terms of the unreliability of the confession, the lack of rational choice of the accused, or simply a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion.
*Id.* 361 U.S. at 207, 80 S.Ct. at 280. Compare Jackson v. Denno, *supra* note 37, 378 U.S. at 376–377, 385–386, 84 S.Ct. 1774; Rogers v. Richmond, *supra* note 31, 365 U.S. at 540–541, 81 S.Ct. 735.

41. See note 40, *supra.*

42. See note 40, *supra.*

other is deterrence of unlawful police conduct.[43] And last, but hardly least, is the integrity of a criminal justice process which should not stoop to take advantage of a person whose volitional power is seriously impaired—as in *Blackburn,* by insanity,[44] or here, by intoxication. These are essentially due process values, and the Due Process Clauses have provided the basis for all of the involuntariness cases of the past three decades—with the exception of *Miranda* and its progeny, which are not applicable here.[45]

In particular fact patterns, two or more of the four interests the Supreme Court identified in *Blackburn* may be implicated. That does not suggest to me that these values are necessarily so interrelated that they can exert force only in unison. On the contrary, I think, abrogation of any one of them will suffice to render a confession inadmissible even if none of the other three is infringed. No untrustworthy statement is admissible even if freely made by a rational person, without even so much as a hint of police coercion.[46] No statement made under police duress is admissible, regardless of its reliability or rationality.[47] And, I submit, no statement not made rationally and freely is admissible, although there may have been no illegal elicitation by police, and although it may be entirely trustworthy.

## D. *Rationality and Free Will*

The definitional elusiveness of "rationality" and "free will" as concepts has not impeded the Supreme Court in the recurrent use of those terms and similar expressions in opinions dealing with voluntariness.[48] "Rationality" is not synonymous with prudence,[49] nor is an exercise of "free will" demonstrated merely by showing some sort of conscious choice.[50] Rather, as this court quite recently emphasized, the terms have very different meanings in the voluntariness context. In Pea v. United States,[51] we explained that "[a] man's free will and intellect necessarily embrace a freedom of choice," [52] and that

43. See note 40, *supra.*

44. See, *e. g.*, Blackburn v. Alabama, *supra* note 30, 361 U.S. at 207–208, 80 S.Ct. 274.

45. See Part III(A), *supra.*

46. Untrustworthiness of an involuntary confession was a prime basis for the common law rule excluding it. See 3A Wigmore, Evidence § 822 (Chadbourn ed. 1970).

47. See Part III(E), *infra.*

48. See, *e. g.*, Haynes v. Washington, 373 U.S. 503, 514, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963) (confession must be "product of a free and unconstrained will") ; Townsend v. Sain, 372 U.S. 293, 307, 83 S.Ct. 745, 9 L. Ed.2d 770 (1963) ("product of a free intellect") ; Rogers v. Richmond, *supra* note 32, 365 U.S. at 544, 81 S.Ct. 735 ("freely self-determined") ; Blackburn v. Alabama, *supra* note 30, 361 U.S. at 207, 208, 211, 80 S.Ct. 274 ("rational choice," "independence of will," "rational intellect and free will," "meaningful act of volition") ; Watts v. Indiana, 338 U.S. 49, 53, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949) ("expression of free choice") ; Ashcraft v. Tennessee, 322 U.S. 143, 154, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) ("mental freedom").

49. If given that connotation, the determination of "rationality" could have widely variant results in different cases. For example, it would not be rational, in the popular sense, for a suspect to confess where there is no other evidence to link him to the crime, but it would be eminently rational for him to talk where such a manifestation of his consciousness of guilt and desire to cooperate with police would have a mitigating impact on his sentence.

50. "When, for example, threats are used, the situation is one of choice between alternatives, either one disagreeable, to be sure, but still subject to a choice. As between the rack and a confession, the latter would usually be considered the less disagreeable; but it is nonetheless a voluntary choice. From this point of view the term 'voluntary,' as describing the absence of the vicious element which excludes a confession, is in ultimate exactness, unsound, because all conscious verbal utterances are and must be voluntary." 3A Wigmore, Evidence § 826 at 349 (Chadbourn ed. 1970) (footnote omitted).

51. 130 U.S.App.D.C. 66, 73, 397 F.2d 627, 634 (1967).

52. Our full statement was:
A man's free will and intellect necessarily embrace a freedom of choice. Whether a man may speak out at a given time, and

"a testimonial statement, whether made at or before trial presents the unique evidentiary contribution of 'an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give.' "[53] "The make-up of a free man includes," we continued, "his mechanisms for self-preservation, to refrain from speech that may endanger him."[54] And "his statement," we concluded, "does not reflect his own free will or intellect if his statement is attributable in critical measure to the fact that his self-protective mechanism is negated or overridden by external force or fraud, a condition of insanity, the compulsion of drugs . . . [or] the concussion of a bullet shattering in his head, leaving him with the external appearance of coherence, but devoid of his normal will to protect himself and rendered indifferent to protect himself."[55]

When evidence of mental illness,[56] drug use,[57] physical or psychological duress,[58] or intoxication[59] indicates that an inculpatory statement was not understandably and volitionally made, the due process guaranties of the Fifth and Fourteenth Amendments require that

what he may say, reflect the tension of manifold forces within him, some moving him to speak, others to refrain from speaking. The number and quality of these forces are as complex as the emotions, ego and conscience of man. The statement, if any, that is the resultant of these forces will depend on the kind of stimuli before him and the kind of person he is, but whether he is noble or ignoble, in general or on the particular occasion, his statement reflecting his freedom of choice, his free will and free intellect, is admissible in evidence against him. As distinguished from inanimate evidence a testimonial statement, whether made at or before trial presents the unique evidentiary contribution of 'an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give.' Smith and Bowden v. United States, 117 U.S.App.D.C. 1, 3, 324 F.2d 879, 881 (1963).

The make-up of a free man includes his mechanisms for self-preservation, to refrain from speech that may endanger him. If he does speak out his statement is admissible as the reflection of his free will if his self-preservation mechanism, and its impetus to silence, is overridden by pressures within his own personality, by his own conscience, religious feelings, sense of duty, etc. But his statement does not reflect his own free will or intellect if his statement is attributable in critical measure to the fact that his self-protective mechanism is negated or overridden by external force or fraud, a condition of insanity, the compulsion of drugs. And we think it manifest that his free will is likewise negatived if his statement reflects the concussion of a bullet shattering in his head, leaving him with the external appearance of coherence, but devoid of his normal will to protect himself and rendered indifferent to protect himself.
*Id.* (footnote omitted).

53. See note 52, *supra.*

54. See note 52, *supra.*

55. See note 52, *supra.*

56. Blackburn v. Alabama, *supra* note 30, 361 U.S. at 207–211, 80 S.Ct. 274; Spano v. New York, *supra* note 37, 360 U.S. at 322, 79 S.Ct. 1202; Fikes v. Alabama, *supra* note 30, 352 U.S. at 196, 77 S.Ct. 281; United States v. Robinson, *supra* note 15, 142 U.S. App.D.C. at 52–53, 439 F.2d at 562–563; Eisen v. Picard, *supra* note 27, 452 F.2d at 864–865.

57. Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967); Townsend v. Sain, *supra* note 48, 372 U.S. at 307–309, 83 S.Ct. 745; People v. Heirens, 4 Ill.2d 131, 122 N.E.2d 231, 237 (1954), cert. denied, 349 U.S. 947, 75 S.Ct. 876, 99 L.Ed. 1273 (1955).

58. Townsend v. Sain, *supra* note 48, 372 U.S. at 307–309, 83 S.Ct. 745; Spano v. New York, *supra* note 37, 360 U.S. at 321–323, 79 S.Ct. 1202; Chambers v. Florida, *supra* note 37, 309 U.S. at 238–240, 60 S.Ct. 472; Brown v. Mississippi, *supra* note 37, 297 U. S. at 281–287, 56 S.Ct. 461; Pea v. United States, *supra* note 51, 130 U.S.App.D.C. at 73–74, 397 F.2d at 634–635.

59. Mergner v. United States, *supra* note 34; Gilpin v. United States, *supra* note 27, 415 F.2d at 640; Gladden v. Unsworth, *supra* note 22, 396 F.2d at 379–381; Logner v. North Carolina, 260 F.Supp. 970, 976 (M.D. N.C.1966), aff'd, 392 F.2d 222, 223 (4th Cir.), cert. denied, 393 U.S. 857, 89 S.Ct. 110, 21 L.Ed.2d 126 (1968).

the statement and its fruits be excluded from use in the criminal prosecution.[60] What, in the case at bar, in my view should have been ascertained was the impact of extreme intoxication on Bernett's rationality and free will. The starting point in that inquiry was our own established doctrine that intoxication to the extent of "mania" renders a confession inadmissible.[61] That doctrine is by no means novel, having been the rule in a number of jurisdictions for some time.[62] Beyond that, the proposition that extreme intoxication can so overpower the reason and free will of a suspect that his confession is involuntary is strongly supported by a recent decision from the Ninth Circuit.

In Gladden v. Unsworth,[63] a state appealed a district court's grant of a writ of habeas corpus on grounds that Unsworth's second-degree murder conviction was in part predicated on involuntary admissions by him to the police. Among the statements challenged were several spontaneous oral remarks made shortly after the police arrived at Unsworth's cabin and found him "staggering" and "jabbering" in a drunken state. The district court held that these statements, made at a time when he had imbibed so much that he had "no understanding or realization of what was going on or what he was saying," [64] should have been excluded at Unsworth's state court trial since his intoxicated condition rendered them involuntary.[65] The Court of Appeals concurred in the district court's conclusion that the petitioner's gross intoxication carried with it such a potential for invasion of his constitutional rights that the guilty verdict could not stand unless vindicated by further inquiry.[66] Instead of resolving for itself the issue of voluntariness, the court followed the procedure in Jackson v. Denno [67] and remanded the case to the state courts for such a determination.[68]

One factual aspect of Gladden v. Unsworth renders it particularly relevant to the case before us. Like the statement challenged here, the incriminating admissions in *Gladden* were completely spontaneous; [69] there was no evidence of improper interrogation by the police.[70] The state argued that this circumstance militated against a finding of involuntariness, but the court disagreed, saying:

> [V]oluntariness is not necessarily established by proving that the confession was spontaneous or by proving the absence of an improper purpose on the part of the questioning officers. If by reason of mental illness, use of drugs, or extreme intoxication, the confession in fact could not be said to be the product of a rational intellect and a free will, to use the test of Townsend v. Sain,[71] it is not admissible and its reception in evidence constitutes a deprivation of due process.[72]

60. Harrison v. United States, 392 U.S. 219, 222–226, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); Blackburn v. Alabama, *supra* note 30, 361 U.S. at 210, 80 S.Ct. 274.

61. See cases cited *supra* note 34.

62. See Annot., 69 A.L.R.2d 361, 369–370 (1960).

63. *Supra* note 22.

64. Unsworth v. Gladden, *supra* note 35, 261 F.Supp. at 902.

65. 396 F.2d at 375.

66. Gladden v. Unsworth, *supra* note 22, 396 F.2d at 381.

67. 378 U.S. at 394–396, 84 S.Ct. 1774.

68. Gladden v. Unsworth, *supra* note 22, 396 F.2d at 381.

69. *Id.* at 379–380.

70. *Id.*

71. *Supra* note 48.

72. Gladden v. Unsworth, *supra* note 22, 396 F.2d at 380–381.

Similarly, in Gilpin v. United States, *supra* note 27, the appellant was arrested for public drunkenness and taken to jail. While being fingerprinted he indicated a desire to speak to one of the arresting officers, and he then blurted out that he had stolen a United States mail bag. The trial court held that this .spontaneous confession, while not the result of any prompting by police, was nevertheless inadmissible because Gilpin was so intoxicated that "his will was overborne," 415 F.2d at 640. This determination was left undisturbed on appeal—from the admis-

For me, *Gladden* is the touchstone. Taking "rationality" and "free will" in the sense in which the Supreme Court has employed these terms, no basis appears for treating extreme intoxication differently from insanity, drugs, torture or psychological duress for purposes of applying the voluntariness doctrine.[73] The common characteristic of all is their propensity for overriding the normal decision-making mechanism of the human intellect to the extent that the suspect is effectively deprived of his rational and volitional capacity. Both in law and in logic, the conclusion seems inescapable that due process is offended by allowing in evidence a confession given while in a condition of such gross intoxication that reason and will are thus impaired. The only possible basis for declining to apply that principle in Bernett's case would be that possible trustworthiness of a confession negates its involuntariness, or that police custody is prerequisite to any application of the voluntariness doctrine. To these problems I now turn.

### E. *Trustworthiness*

As previously observed, the Supreme Court, in Blackburn v. Alabama,[74] pointed out that one reason why involuntary confessions are excluded from use in criminal presentations is their possible unreliability.[75] This does not mean that confessions otherwise involuntary become admissible simply because they are believed to be reliable. Even assuming the practicality of an estimate on that score when the ruling on admissibility is made,[76] the Court has now made it plain that trustworthiness, actual or assumed, is not a panacea for involuntariness.[77]

That proposition has not always been clear, however. It was limited in some of the earlier confession cases,[78] and as late as two decades ago it appeared to have been rejected.[79] But in Rogers v. Richmond[80] in 1961, the Court held squarely that a state court denied due process by taking into account the probable truth of challenged confessions. Whether, said the Court, the confessions were "not freely self-determined" was "a question to be answered with com-

---

sion of other confessions—and the Court of Appeals further pointed out that the police had no duty to give Gilpin *Miranda* warnings when he said he wanted to speak with the policeman immediately prior to admitting his theft of the mail bag. *Id.* 386 U.S. at 639, n. 2, 86 S.Ct. 1602. What *Gilpin* teaches, then, is that an unsolicited spontaneous confession, given in a setting in which the police were not even required to administer *Miranda* warnings, may still be excluded as involuntary if the accused was in such a state of gross inebriation that his reason and free will were overridden.

See also Eisen v. Picard, *supra* note 27, where the mentally suspect appellant made damaging pre-custody admissions to friends as well as in-custody admissions to police, all of which came into evidence at his trial. The court recognized the problem as to the former but in view of its reversal on other grounds, did not reach the question whether the voluntariness standard was applicable to the noncustodial statements.

73. See Townsend v. Sain, *supra* note 48, 372 U.S. at 309, 83 S.Ct. 745; Blackburn v. Alabama, *supra* note 30.

74. *Supra* note 30.

75. See note 40, *supra*.

76. The reliability of an incriminating statement cannot be determined merely from the circumstances of its making, and frequently can be corroborated to only an extent by evidence. If the admissibility of a statement were to hinge on its trustworthiness, every case involving a confession would, in effect, have to be tried twice—first to the judge, so that he could determine whether the facts articulated in the confession were sufficiently verified by other evidence to demonstrate trustworthiness; and then to the jury. Any less unwieldy a procedure would risk placing an unreliable statement before the jury, which surely would find it difficult if not impossible to disregard in reaching its verdict.

77. See cases cited in text *infra* at notes 80, 83.

78. See, *e. g.*, Brown v. Allen, 344 U.S. 443, 475, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941).

79. Stein v. New York, 346 U.S. 156, 192, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953).

80. 365 U.S. at 540–541, 81 S.Ct. 735.

plete disregard of whether or not [the accused] spoke the truth." [81] And just a few years later the landmark decision in Jackson v. Denno [82] reaffirmed the *Rogers* principle.[83]

Thus, reliability of incriminating statements is explicitly outlawed as an element in the determination of constitutional voluntariness, and that doctrine is consistent with and is reflected in the constitutional prohibition against applying the harmless error rule in involuntary confession cases.[84] Of course, if trustworthiness were an acceptable factor in the resolution of voluntariness issues, it would be senseless to order new trials in confession cases where the accused's guilt is borne out by evidence other than the involuntary confession, since that evidence would demonstrate the confession's reliability. But just as voluntariness may not be settled on the basis of reliability, other incriminating evidence cannot serve to render the admission of an involuntary confession harmless.[85] Because the facts of Bernett's case bring the statement in issue within the compass of the voluntariness rule, it cannot be dealt with simply in terms of whether it is trustworthy, but must be measured by the due process standards which govern confession cases.

### F. Custody and Voluntariness

Even a cursory look at the cases treating involuntary confessions reveals that they almost invariably involve statements made while the accused is in custody or is about to be taken into custody. There is a simple explanation for this. As a practical matter, guilty admissions made to persons other than law enforcement officials often do not come to the attention of prosecutors. When they do, the closest examination of the surrounding circumstances frequently fails to disclose any sign of involuntariness. Consequently, the bulk of the incriminating statements aired in courtrooms are made at least in the presence of police officers, whether or not the accused in formally in custody.[86] But these factual coincidences, without more, hardly warrant the deduction that custody is an indispensable prerequisite to a finding of involuntariness, and I think a close look at the cases reveals that such a conclusion is not valid.

It has long been the rule that the mere fact that an accused is in custody and subjected to police questioning is not sufficient to raise a voluntariness issue.[87] In every involuntariness case achieving success in the Supreme Court, something beside custody and ordinary questioning came into play as the decisive factor. For example, in Brown v. Mississippi,[88] the pivotal fact was physical abuse inflicted on the accused by police;[89] in Chambers v. Florida,[90] it was psychological coercion;[91] in Townsend v. Sain,[92] it was an injection

---

81. More largely, the Court stated:
   The attention of the trial judge should have been focused, for purposes of the Federal Constitution, on the question whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined —a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth. The employment instead, by the [courts], of a standard infected by the inclusion of references to probable reliability resulted in a constitutionally invalid conviction, pursuant to which Rogers is now detained "in violation of the Constitution."
   *Id.* at 544, 81 S.Ct. at 741.

82. *Supra* note 37.

83. 378 U.S. at 368, 376–377, 383–386, 84 S. Ct. 1774. Stein v. New York, *supra* note 79,

was expressly overruled. *Id.* at 391, 84 S. Ct. 1774.

84. See Part III(H), *infra*.

85. See Part III(H), *infra*.

86. It is not surprising, then, that few situations like Bernett's are found among the reported cases.

87. Culombe v. Connecticut, *supra* note 36, 367 U.S. at 589–592, 81 S.Ct. 1860, and the numerous cases cited in text and in notes 31, 34, *supra*.

88. *Supra* note 37.

89. 297 U.S. at 285–286, 56 S.Ct. 461.

90. *Supra* note 37.

91. 309 U.S. at 238–241, 60 S.Ct. 472.

92. *Supra* note 48.

of truth serum;[93] and in Blackburn v. Alabama,[94] it was the suspect's insanity.[95] Lengthy police interrogation of a normal, healthy person in full possession of his faculties may well produce a confession properly characterized as voluntary, while the same treatment accorded a suspect who is mentally unbalanced would call for a contrary finding with respect to any admission he might make.[96] In perspective, it appears that while custody can be and often is a factor which plays some part in overriding the will of a suspect, standing alone it is much less frequently the really important factor in involuntariness decisions.

Moreover, cases which did not involve custody in the strict sense have indicated that voluntariness questions may well arise where there is nothing more than the presence of and perhaps some questioning by police officers. Thus in Jackson v. Denno,[97] the Supreme Court, while not resolving admissibility of one of two challenged confessions, did hold that the voluntariness issue was raised where the suspect, who took a taxi to the hospital after suffering a gunshot wound, was questioned there by police and a prosecutor while undergoing emergency treatment.[98] And similarly in Pea v. United States,[99] the suspect was receiving hospital emergency room treatment for a bullet wound in the head when asked several questions by a policeman, incriminating responses were held involuntary because of his physical condition; custody played no role whatever in that determination.[100] And in Gladden v. Unsworth,[101] contested oral admissions made upon the arrival of police and neighbors at the suspect's cabin, and prior to his being placed in custody, were held to be involuntary because of his intoxicated condition.[102]

In my view, the circumstances of Bernett's case are not sufficiently dissimilar to those in *Jackson, Pea* and *Gladden* to exempt him from the due process protection of the voluntariness doctrine. Neither Jackson, Pea nor Unsworth was in custody in the sense of being under the control of law enforcement officials in the potentially intimidating setting of a police arrest or a police stationhouse. And yet, in the case of Pea, the incriminating statements were held to be involuntary; and in the cases of Jackson and Unsworth, a serious question as to voluntariness was found to exist. These cases strongly suggest that a court is not precluded from finding that such a problem exists with respect to Bernett's admission simply because he was not yet in custody at the time he spoke to Officer Schleig. I would hold that Bernett's claim of involuntariness is not diminished by the fact that his admission to Officer Schleig was made spontaneously before custody was assumed, and was not in any way induced by the officer.

## G. *Judicial Inquiry and Determinations as to Voluntariness*

Because of my difficulty with the District Court's handling of the sensitive issues involved,[103] I must now focus on the authorities which set forth the procedures appropriate for resolving them. In Jackson v. Denno[104] and Sims v. Georgia[105] the Supreme Court established guidelines for courts confronted by the complexities of a voluntariness determination. A primary concern is that the procedures followed "be fully adequate to insure a reliable and clear-

93. 372 U.S. at 307–309, 83 S.Ct. 745.

94. *Supra* note 30.

95. 361 U.S. at 207–208, 80 S.Ct. 274.

96. With *id.*, compare, *e. g.*, Crooker v. California, 357 U.S. 433, 437–438, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958).

97. *Supra* note 40.

98. 378 U.S. at 371, 372, 391–392, 84 S.Ct. 1774.

99. *Supra* note 51.

100. 130 U.S.App.D.C. at 66, 397 F.2d at 627.

101. *Supra* note 22.

102. 396 F.2d at 379.

103. See Part II, *supra.*

104. *Supra* note 37.

105. *Supra* note 2.

cut determination of the voluntariness of the confession, including the resolution of disputed facts upon which the voluntariness issue may depend." [106] *Jackson* held that the question must in the first instance be dealt with by the judge outside the jury's presence, so that the jury might be fully insulated from possible prejudice generated by receiving evidence of an involuntary confession.[107]

*Sims* treated the problem of a post-*Jackson* confession which was allowed to go to the jury without any evidence in the record that the trial judge had made a preliminary finding on the voluntariness question.[108] Elaborating on *Jackson*, the Court emphasized that "[a]lthough the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." [109] Our pre-*Sims* reading of *Jackson* prompted us to favor express findings on voluntariness,[110] for reasons all too well illustrated by the case before us. By my reading of *Sims*, it is nothing short of an imposition of that wholesome course as a virtual requirement.

The Second Circuit has succinctly outlined the initial steps to be taken in complying with *Jackson* and *Sims* where evidence of impaired volition is present:

> Once it becomes apparent that the accused's mental condition is a factor that ought to be looked into in relation to the admissibility of his confession, the trial judge must hold a hearing at which relevant evidence may be offered, including the testimony of experts, from which the court will decide whether the accused was at the time he confessed so mentally ill that he was unable, with intelligence, knowledge and understanding, to relinquish or abandon a known right or privilege which was his; or whether "the confession most probably was not the product of any meaningful act of volition." If it is found that either of these things is so, the confession must be excluded.[111]

To this I would add, perhaps unnecessarily, that the "unmistakable clarity" mandated in *Sims* [112] can hardly be expected without an express articulation of the court's factual findings and legal conclusions on voluntariness.

If a district court finds involuntariness, a challenged confession or admission, together with its fruits,[113] must be excluded from use at trial.[114] If the court makes the converse determination, the confession may, of course, be introduced into evidence. In the latter event, in the federal system, as now required by statute, "the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances." [115]

Having concluded that the District Court did not fully analyze and resolve all aspects of Bernett's involuntariness claim, I now must examine the Government's assertion that the failure amounts at most to harmless error.

### H.   *The Impact of the Ruling*

The Government's harmless-error argument is that, in view of Ms. Clark's

---

106.  Jackson v. Denno, *supra* note 37, 378 U. S. at 391, 84 S.Ct. at 1788.

107.  *Id.* at 377–391, 84 S.Ct. 1774.

108.  385 U.S. at 541, 87 S.Ct. 639.

109.  *Id.* at 544, 87 S.Ct. at 643.

110.  Hutcherson v. United States, 122 U.S. App.D.C. 51, 58, 351 F.2d 748, 755 (1965).

111.  United States v. Silva, 418 F.2d 328, 330 (2d Cir. 1969), quoting Blackburn v. Alabama, *supra* note 30, 361 U.S. at 211, 80 S. Ct. 274 (citations omitted).

112.  *Supra* note 2, 385 U.S. at 544, 87 S.Ct. 639.

113.  Harrison v. United States, *supra* note 60, 392 U.S. at 222–226, 88 S.Ct. 2008.

114.  Blackburn v. Alabama, *supra* note 30, 361 U.S. at 210, 80 S.Ct. 274.

115.  Omnibus Crime Control and Safe Streets Act of 1968, Pub.L.No.90–351, tit. II, § 701(a), 82 Stat. 210, 18 U.S.C. § 3501(a) (1970). See Part IV, *infra*.

testimony regarding Bernett's admissions to her and his own testimony at trial,[116] the challenged statement to Officer Schleig was merely cumulative on the question of Bernett's guilt. Because I find the doctrine of harmless error to be inapplicable here, I would reject this contention.

Prior to the Supreme Court's decision in Chapman v. California,[117] it was open to question whether a defect of constitutional stature in a criminal trial could ever be considered harmless. In *Chapman*, though recognizing that "harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence, or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one," [118] the Court nevertheless concluded that "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." [119] *Chapman* laid down the rule that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." [120]

So, while conceding the possibility that "some constitutional errors" in the setting "of a particular case" could be so "unimportant and insignificant" as to be innocuous, the Court in *Chapman* took pains to point out that its prior decisions indicated that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." [121] As an example, the Court cited Payne v. Arkansas,[122] one decision in a long line prohibiting the admission into evidence of coerced confessions.[123] A very helpful elucidation of the doctrine which immunizes involuntary confessions from application of the harmless error rule is set forth in Justice Stewart's concurring opinion in *Chapman*:

> When involuntary confessions have been introduced at trial, the Court has always reversed convictions regardless of other evidence of guilt. As we stated in Lynumn v. Illinois,[124]
>
> . . . the argument that the error in admitting such a confession "was a harmless one . . . is an impermissible doctrine." That conclusion has been accorded consistent recognition by this Court. . . . Even when the confession is completely "unnecessary" to the conviction, the defendant is entitled to "a new trial free of constitutional infirmity." [125]

And in a footnote, Justice Stewart further points out:

> None of these decisions suggests that the rejection of a harmless error rule turns on any unique evidentiary impact that confessions may have. Haynes v. Washington [126] . . . specifically contradicts that notion. In addition to the confession found inadmissible by this Court, the defendant in *Haynes* had given two prior confessions, the admissibility of which was not disputed, and "substantial independent evidence" of guilt existed. The Court accepted the prosecution's contention that the inadmissible confession played little if any role in the conviction.[127]

---

116. See Part I, *supra*.

117. 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

118. *Id.* at 22, 87 S.Ct. at 827.

119. *Id.*

120. *Id.* at 24, 87 S.Ct. at 828.

121. *Id.* at 23 & n. 8, 87 S.Ct. at 827.

122. *Supra* note 37.

123. 356 U.S. at 568, 78 S.Ct. 844.

124. 372 U.S. 528, 537, 83 S.Ct. 917, 9 L.Ed. 2d 922 (1963).

125. Chapman v. California, *supra* note 117, 386 U.S. at 42–43, 87 S.Ct. at 837 (concurring opinion) (citations omitted).

126. *Supra* note 48.

127. Chapman v. California, *supra* note 117, 386 U.S. at 43 n. 8, 87 S.Ct. at 837.

My own probe of the law on voluntariness has identified the Court's several decisions which fully bear out the analysis in *Chapman* on this point.[128] A recurring theme in these opinions is that no matter how much evidence of guilt exists independently of the impermissible confession, its introduction into evidence constitutes a deprivation of due process which can never be labeled "harmless."[129] Nor do the cases draw any distinction between nontestimonial evidence of guilt and voluntary incrimination from the accused's own lips for purposes of this exemption from harmless-error doctrine. Thus in Haynes v. Washington,[130] although the trial court had admitted without defense objection two voluntary oral statements of the accused "identical in relevant details"[131] to a coerced written confession made the following day, the Court staunchly adhered to its traditional refusal to find harmless error.[132] I have no alternative but to conclude that despite Bernett's unchallenged statements to Ms. Clark and despite his own self-defense account at trial, I cannot dispose of his voluntariness contention on the ground that

admission of his remarks to Officer Schleig was harmless error.[133]

What this court is called upon to do in this case is to discharge the difficult but nonetheless commonplace judicial task of applying available precedents to a situation factually variant from nearly all those to be found in the case reports. This is always demanding, and is never to be undertaken without maximum care and thought. I cannot believe that the constitutional doctrine of voluntariness in criminal confessions would suffer distortion from a holding that where the facts reveal that a suspect is grossly intoxicated at the time he makes an incriminating statement, there should be a specific determination as to whether his reason and will were so impaired by alcohol—just as they might be by drugs, madness, or police-induced coercion— that his words were not voluntarily spoken. My research has led me to but few cases holding a statement made under such circumstances inadmissible,[134] and to none at all holding such a statement admissible. But the cases I have scrutinized convince me as to the correct path to be taken.

128. See cases cited *infra* note 129.

129. Haynes v. Washington, *supra* note 48, 373 U.S. at 518, 83 S.Ct. 1336; Lynumn v. Illinois, *supra* note 124, 372 U.S. at 537, 83 S.Ct. 917; Rogers v. Richmond, *supra* note 31, 365 U.S. at 541, 81 S.Ct. 735; Payne v. Arkansas, *supra* note 37, 356 U.S. at 568, 78 S.Ct. 844; Stroble v. California, 343 U.S. 181, 190, 72 S.Ct. 599, 96 L.Ed. 872 (1952); Malinski v. New York, 324 U.S. 401, 404, 65 S.Ct. 781, 89 L.Ed. 1029 (1945); Lyons v. Oklahoma, 322 U.S. 596, 597 n. 1, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944).

We are mindful that this exception in the harmless error doctrine is narrow. Immunity from the application of that doctrine is accorded only to defects which result in the admission into evidence of confessions which are either involuntary or seriously questionable. The exemption does not extend to nonconstitutional errors however closely related to a confession. Thus, for example, where we discern a flaw in a jury charge concerning a confession allowed into evidence, we are not foreclosed from concluding that the error was harmless if the

facts warrant such a conclusion. See Part IV, *infra.*

130. *Supra* note 48.

131. 373 U.S. at 521, 83 S.Ct. 1336 (dissenting opinion).

132. 373 U.S. at 518, 83 S.Ct. 1336.

133. My conclusion in this regard is fully consistent with our later holding that the District Court's omission of Bernett's requested instruction was harmless error. See Part IV, *infra,* at notes 94–110. The case law precludes acceptance of an admission of an involuntary confession as a harmless event. See Kotteakos v. United States, 328 U.S. 750, 765 n. 19, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Of a very different character is the court's failure to instruct the jury on the weight to be accorded the statement. That error did not withhold from Bernett a constitutional right, nor did it cause any perceptible prejudice to his case. Hence we are free, and as well are bound, to apply the harmless error test there.

134. See Part III(D), *supra,* at notes 63–72, and note 72, *supra.*

## IV. THE FAILURE TO CHARGE THE JURY ON THE CHALLENGED ADMISSION

We must now turn our attention to Bernett's second complaint on appeal: the failure of the District Court to instruct the jury concerning either the voluntariness of, or the weight to be given to, Bernett's incriminating admission to Officer Schleig. If this omission amounted to prejudicial error, Bernett is entitled to a new trial. My colleagues and I hold unanimously that the omission was error, but in the circumstances was not harmful to Bernett.

The Supreme Court, in its treatment of voluntariness questions, has deemed either of two procedures—the so-called "Massachusetts" rule and the "orthodox" rule—to be constitutionally acceptable for resolving such claims.[135] Under both methods, the initial determination as to the admissibility of the contested confession or admission is made by the trial judge outside the presence of the jury.[136] Where the judge finds the utterance to be voluntary, it may be admitted along with the evidence which bears on its volitional character.[137] Under the Massachusetts procedure, the judge then charges the jurors that they must determine for themselves the voluntariness of the accused's statement and must disregard it if they find it involuntary.[138] Under the orthodox rule, the jury is simply instructed that the statement must be accorded whatever weight it concludes it deserves in view of all the surrounding circumstances.[139]

In the past, our circuit followed the Massachusetts rule, with the judge instructing the jury to redetermine the voluntariness question after the judge had initially resolved it, and admonishing the jurors to discount the statement in their deliberations unless they found it voluntary beyond a reasonable doubt.[140] However, in 1968 Congress ordained that thenceforth voluntariness determinations in the federal courts must follow the orthodox practice.[141] Under the new statute, the trial judge, having satisfied himself that a confession[142] is voluntary,

> . . . shall permit the jury to hear relevant evidence on the issue of vol-

135. Jackson v. Denno, *supra* note 37, 378 U.S. at 378 & n. 8, 84 S.Ct. 1774; United States v. Robinson, *supra* note 15, 142 U.S.App.D.C. at 65, 439 F.2d at 575 (dissenting opinion).

136. Jackson v. Denno, *supra* note 37, 378 U.S. at 378, 84 S.Ct. 1774; United States v. Robinson, *supra* note 15, 142 U.S.App.D.C. at 65, 439 F.2d at 575.

137. United States v. Robinson, *supra* note 15, 142 U.S.App.D.C. at 65, 439 F.2d at 575.

138. *Id.*

139. *Id.*

140. *Id.;* Pea v. United States, *supra* note 51, 130 U.S.App.D.C. at 76–77, 397 F.2d at 637–638. See also Clifton v. United States, 125 U.S.App.D.C. 257, 262–263, 371 F.2d 354, 359–360 (1966), cert. denied, 386 U.S. 995, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967). *Pea* required that in his initial voluntariness determination the judge adhere to the reasonable doubt standard, but the Supreme Court has since decided in Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), that he need only find the confession voluntary by a preponderance of the evidence before submitting it to the jury.

141. Omnibus Crime Control and Safe Streets Act of 1968, Pub.L.No. 90–351, tit. II, § 701(a), 82 Stat. 210, 18 U.S.C. § 3501(a) (1970), which in relevant part provides:

> In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

142. "As used in this section, the term 'confession' means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing." Omnibus Crime Control and Safe Streets Act of 1968, Pub.L.No.90–351, tit. II, § 701(a), 82 Stat. 211, 18 U.S.C. § 3501(e) (1970).

untariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.[143]

This was the applicable procedure at the time Bernett was tried.

■■■ The record before us reflects that the District Court followed neither the Massachusetts nor the orthodox rule in instructing the jury at Bernett's trial. The charge made no mention whatever of the admission to Officer Schleig, and defense counsel neither requested the court to instruct the jury on that matter nor objected to its failure to do so. We are mindful of the general rule that "[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires. . . ."[144] It is equally clear, however, that we may overlook a lack of objection where the defect in the instructions amounts to plain error affecting substantial rights of the accused.[145] In view of the unequivocal statutory mandate that an instruction be given as to the weight which might be accorded a confession or admission received in evidence, the omission of the instruction in this case was

error of the plainest sort. A more difficult task is to ascertain whether Bernett suffered such prejudice therefrom that he must be given a new trial.[146]

The point of departure in distinguishing nonconstitutional errors which are prejudicial from those which are merely harmless is Kotteakos v. United States.[147] That decision directs a federal appellate court to base its evaluation of injury not on its own speculation as to whether the accused was guilty, but on a determination of the effect which the error had or reasonably may be taken to have had on the jury's verdict.[148] And if in the end the court is sure that the error did not influence the jury or influenced it but slightly, the verdict should stand "except perhaps where the departure is from a constitutional norm or a specific command of Congress."[149] The quoted language is troubling in view of the fact that the error here consisted in the disregard of a "specific command of Congress."[150] There are cases wherein misstatements or omissions in jury charges which have deprived accused persons of legislatively conferred rights have resulted in reversal of the conviction on appeal.[151] And the implication

143. Omnibus Crime Control and Safe Streets Act of 1968, Pub.L.No.90–351, tit. II, § 701(a), 82 Stat. 210, 18 U.S.C. § 3501(a) (1970).

144. Fed.R.Crim.P. 30.

145. See Fed.R.Crim.P. 52(b); Singer v. United States, 380 U.S. 24, 38, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965); Howard v. United States, 128 U.S.App.D.C. 336, 339, 389 F.2d 287, 290 (1967); Surratt v. United States, 106 U.S.App.D.C. 49, 50, 269 F.2d 240, 241 (1959), cert. denied, 371 U.S. 880, 83 S.Ct. 152, 9 L.Ed.2d 116 (1962); Tatum v. United States, 88 U.S.App.D.C. 386, 388–389, 190 F.2d 612, 614–615 (1951); Felton v. United States, 83 U.S.App.D.C. 277, 278, 170 F.2d 153, 154, cert. denied, 335 U.S. 831, 69 S.Ct. 18, 93 L.Ed. 385 (1948).

146. See, e. g., Jones v. United States, 128 U.S.App.D.C. 36, 40, 385 F.2d 296, 300 (1967); Bartley v. United States, 115 U.S.App.D.C. 316, 318–319, 319 F.2d 717, 719–720 (1963); Tatum v. United States, supra note 145, 88 U.S.App.D.C. at 391, 190 F.2d at 617; Mullins v. United States, 382 F.2d 258, 262 (4th Cir. 1967).

147. Supra note 133.

148. 328 U.S. at 763, 764, 66 S.Ct. 1239; United States v. Lewis, 157 U.S.App.D.C. 43, 57–58, 482 F.2d 632, 646–647 (1973).

149. Kotteakos v. United States, supra note 133, 328 U.S. at 764–765, 66 S.Ct. at 1248.

150. The legislative history informs us that by § 3501(a) "[t]he trial judge is required to instruct the jury to give the confession such weight as it feels it is entitled under all the circumstances." S.Rep. No. 1097, 90th Cong., 2d Sess. 37 (1968) U.S.Code Cong. & Admin.News, p. 2123.

151. Brotherhood of Carpenters v. United States, 330 U.S. 395, 407–410, 67 S.Ct. 775, 91 L.Ed. 973 (1947); Bruno v. United States, 308 U.S. 287, 292–294, 60 S.Ct. 198, 84 L.Ed. 257 (1939). In each of these cases the trial judge refused to give instructions requested by the defense, which the Supreme Court subsequently found to be accurate statements of relevant law. Although the statutory provisions involved were significant factors in the Court's decisions, the Kotteakos test of prejudice probably would

of *Kotteakos* is that especially close scrutiny for prejudice must be exercised by appellate courts whenever a statutory privilege has been abrogated.

From the outset we bear in mind the important role of jury instructions in the criminal trial. These "vital cogs in the federal judicial machinery" [152] supply the jurors with the legal standards upon which the issues submitted to them must be resolved. "On . . . [the] coverage and caliber [of the instructions] depends the integrity of jury verdicts and, in the long run, the worth of the jury system itself." [153] So, "[f]or the very best of reasons, a party is entitled to have the jury instructed on all essential questions of law involved in the case." [154] Thus courts have reversed convictions where no instruction was given on criminal responsibility in a case presenting an insanity defense; [155] where no instruction was given on the limited purpose of prior inconsistent statements introduced to impeach a witness; [156] where no instruction was given that a negative inference could not be drawn from the accused's failure to testify; [157] where no instruction was

given that a conviction for perjury must be based on the testimony of at least two witnesses or on that of one witness with independent corroboration; [158] and, in a Massachusetts-rule jurisdiction, where no instruction was given on the jury's duty to redetermine the voluntariness of a confession.[159] There are other examples, but these suffice to illustrate the principle, common to them all, that new trials will be granted where the omitted instruction deals with a legal principle of such magnitude that, had the jury considered it, the verdict could have been substantially affected. What we must endeavor to ascertain is the probable impact on the verdict here of the court's failure to charge the jury concerning the weight to be accorded the statement under review.

At trial, Officer Schleig related that when Bernett was asked his name, he replied, "Jimmy Bernett. I know the police are looking for me because I got in a fight over at 1441 Euclid Street. I hit the man twice with the stool leg, once in the forehead, once behind the head. I think I killed him." [160] Ms. Clark recalled Bernett's response some-

have been met even if the rights involved had no legislative underpinning since in both cases the omitted instructions were likely to have had a substantial impact on the verdict. It should be kept in mind that *Kotteakos* does not purport to absolutely bar application of the harmless error rule in cases where a statutory command has been ignored, but says only that "perhaps" an exception exists in such cases. 328 U.S. at 764–765, 66 S.Ct. 1239.

152. United States v. Young, 150 U.S.App.D. C. 98, 110, 463 F.2d 934, 946 (1972) (concurring opinion).

153. *Id.* See also Tatum v. United States, *supra* note 145, 88 U.S.App.D.C. at 389, 190 F.2d at 615.

154. United States v. Young, *supra* note 152, 150 U.S.App.D.C. at 110, 463 F.2d at 946 (concurring opinion).

155. Tatum v. United States, *supra* note 145, 88 U.S.App.D.C. at 391, 190 F.2d at 617.

156. Jones v. United States, *supra* note 146, 128 U.S.App.D.C. at 40, 385 F.2d at 300; Bartley v. United States, *supra* note 146, 115 U.S.App.D.C. at 319, 319 F.2d at 720.

157. Bruno v. United States, *supra* note 151, 308 U.S. at 294, 60 S.Ct. 198.

158. Weiler v. United States, 323 U.S. 606, 611, 65 S.Ct. 548, 89 L.Ed. 495 (1945).

159. Mullins v. United States, *supra* note 146, 382 F.2d at 262. We think *Mullins* can be distinguished from the case at bar. Under the Massachusetts procedure, it is unlikely that the jury will realize that it can redetermine the voluntariness of a confession unless a specific instruction to that effect is given. Thus where such an instruction is omitted, the accused is deprived of the reassessment to which the Massachusetts rule entitles him. Here we are concerned with an omission to charge the jurors to give the confession such weight as they feel it deserves. Since jurors are apt to already have that understanding, and are customarily given a general instruction on weighing the evidence, the failure to specifically mention the confession in this regard is an omission different in kind as well as in degree from that involved in *Mullins.* See discussion in text *infra.*

160. This comports with Officer Schleig's recollection of the statement in his suppression hearing testimony. See note 9, *supra.*

what differently. According to her, Bernett blurted out his name and told the officer he had killed a man on Euclid Street, and in reply to further questioning related the details of the incident.[161] Bernett's own recollection of the episode was that he gave the officer his name when asked, and added that he knew the police were looking for him because he had hit a man and "they claim he died." All three witnesses testified that Bernett had consumed a large quantity of alcohol, and Officer Schleig stated flatly that Bernett was drunk.

Whichever of the three versions of Bernett's incriminating concessions the jury chose to believe, it amounted to little more than a succinct summary of his own testimony at the trial. The only conflict between Bernett's statement, as variously recounted by the witnesses, and Bernett's self-defense account was that he claimed he struck his victim once while Officer Schleig said that Bernett acknowledged striking him twice.[162] In no material way was Bernett's testimony contradicted by the substance of the challenged admission. Thus, even if, for lack of a guiding instruction, the jurors mistakenly believed that they were to credit the statement fully, it could hardly have prejudiced the defense which Bernett advanced.

Beyond that, it is of course quite possible, on the other hand, that the jury gave less than full weight or perhaps no weight at all to the statement, even without the benefit of an instruction that they could discount it if they chose.[163] From three different witnesses the jurors sitting in judgment on Bernett knew that he was highly intoxi-cated when he spoke to Officer Schleig. Moreover, the jurors were given the standard charge to "weigh all the evidence in the case." While this did not call their attention specifically to Bernett's utterances, it nonetheless imposed on them the responsibility to evaluate it just as they would any other piece of evidence.

In sum, it appears that even in the unlikely event that the jury felt bound to accept the challenged statement at face value because they were not instructed that they could give it less weight, we cannot believe that Bernett's remarks to Officer Schleig worked to the detriment of his defense. And given the general understanding of jurors' prerogatives, the evidence of Bernett's drunkenness, and the admonition of the court that then jurors weigh all the evidence, it is improbable that they were unaware of their power to accord less than full weight to the impugned statement, and they may well have chosen to do so. Unable as we are to isolate any real chance that the error committed here substantially affected Bernett's rights at trial, we must conclude that the court's failure to instruct the jury as statutorily required was harmless.

## V.  DISPOSITION

In reviewing this case, we have identified problems as to the District Court's ruling on the admissibility of Bernett's oral statement to Officer Schleig. We do not disturb the trial court's finding that it was made in a noncustodial setting, and a majority of this court is of the view that the voluntariness inquiry properly terminated with that finding, and that the ruling is to be affirmed.[164]

---

161. At trial Officer Schleig denied having asked Bernett anything but his name while at Ms. Clark's apartment.

162. The medical examiner's report revealed that the victim had suffered two blows to the head.

163. It could not be successfully contended that the jury's acceptance of the statement was indispensable to its verdict of guilty. Bernett's presence in the apartment at the time of the homicide was strongly indicated.

There was evidence of ill feeling between Bernett and Nixon, the deceased, emanating from Bernett's belief that Nixon had stolen money and food stamps from him. Bernett's claim of self-defense against an attack by Nixon with a crutch was confronted by the fact that Nixon could scarcely move with his thigh-high cast and the further fact that after the homicide Nixon's crutches were found in another room.

164. See Judge Wilkey's opinion following.

I disagree, and would remand for a determination as to whether Bernett was so intoxicated at the time he made the incriminating statement that it could not be said to be the product of a rational intellect and free will.[165] By my approach, if the court should find that the declaration was voluntarily and intelligently given, Bernett's conviction must be left undisturbed; in the event that a contrary determination should be made, Bernett would become entitled to a new trial at which the statement and its fruits would be excluded.[166] My position, however, as stated, does not prevail.

Although we find error in the District Court's failure to comply with the statutory procedure for charging the jury on the weight to be given a confession, we all conclude that Bernett suffered no prejudice as a result of that omission.[167] Consequently, a new trial is not necessitated on that account.

The judgment of conviction appealed from is accordingly

Affirmed.

WILKEY, Circuit Judge, with whom JAMESON, Senior District Judge, concurs:

We hold that defendant Bernett's statement in response to Officer Schleig's inquiry, "What is your name," was made in a non-custodial setting, was uncoerced, and therefore could not have been involuntary within the meaning of the decided cases. The District Judge's ruling admitting the statement into evidence was therefore correct and provides no ground for reversal.

## I. Facts

Any analysis of the possible constitutional issues presented must turn on an acute appreciation of the situation as it appeared to the District Judge on uncontradicted evidence. Bernett's blurted drunken confession took place before any police interrogation, save a request for his name. It took place before he was placed in anything resembling custody. There was absolutely no evidence or allegation of *coercion;* and the policeman's presence in the room was solicited by a private party rather than the result of an official investigation.

The police officer was asked in by Mrs. Clark; but he specifically testified that neither this, nor any other circumstances, raised anything in his mind approaching official focused suspicion on Bernett. The policeman did ask Bernett his name, which hardly amounts to more than a preliminary inquiry. It does not reach the level of interrogation which would either require a *Miranda* warning or which would amount to subtle official intimidation. Mrs. Clark did supply Bernett with alcohol, which probably served to keep him within range of the police and to dull his ability to protect himself against the urge to confess. There is no question that police action of this sort would amount to "coercion" in some sense, despite the fact that it was Bernett's choice to imbibe the proffered refreshment, but Mrs. Clark's action was not police action.

In short, there was no evidence of the sort of state inquisition or coercion which would normally result in exclusion of a confession. Given these undisputed facts, the defendant's plea for a reversal and remand for clarification necessarily implies some sort of constitutional right not to have one's case blown by internally generated guilt, fear, stupidity, or drunkenness.

## II. The Constitutional and Other Issues

### A. Self-Incrimination

The basis for the constitutional doctrine that involuntary confessions are inadmissible in federal court is the Fifth Amendment privilege against self-incrimination. The language of the self-incrimination clause, "[n]o person . . . shall be *compelled* in any criminal case to be a witness against himself

---

165. See Part III, *supra.*

166. See Part III, *supra.*

167. See Part IV, *supra.*

. . . ," demonstrates that some form of governmental *compulsion* is a basic element of an involuntary confession. As the Supreme Court stated in Malloy v. Hogan:

> [I]n Bram v. United States, 168 U.S. 532 [18 S.Ct. 183, 42 L.Ed. 568], the Court held that "[i]n criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States, commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'"

*Id.,* 168 U.S. at 542 [18 S.Ct. 183 at 187]. Under this test, the constitutional inquiry is not whether the conduct of [government] officers in obtaining the confession was shocking, but whether the confession was "free and voluntary: that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . ." *Id.,* at 542–543 [18 S.Ct. 183 at 186–187] [Further citations omitted]. In other words the person must not have been *compelled* to incriminate himself.[1]

■ It becomes clear that Bernett's confession, on the undisputed facts, could not have been generated by constitutionally impermissible coercion. On the rationale of all the Supreme Court decisions in this field, it could not, therefore, have violated his constitutional right not to be compelled to be a witness against himself in a criminal case.

What the defendant contends for on this appeal is a far-reaching and quite novel principle—namely, that a *pre-custody, non-coerced* inculpatory statement is constitutionally inadmissible in a criminal action unless the trial judge first finds, in a separate hearing, that it

was "the product of a rational intellect and a free will."

Since there was absolutely no allegation or evidence of coercion, nor was there at the time of the incriminating statement any custody, the "voluntariness" finding, which the defendant asserts as an indispensable prerequisite of the admission being admissible, must amount to a *required finding* that the appellant made a "rational" and "free-will" decision to talk in a non-custodial situation. To state this principle as a prerequisite to admissibility is to recognize how fundamentally different such a principle would be from the circumstances and holding of any previous case cited in its support. For it is hard to see how such a decision to make the statement appellant made here could ever, in a lawyer's terms, be "rational" in a non-custodial situation.

While rationality might be highly relevant if the appellant's comments were made in a situation of attempted compulsion, and thus amounted to a waiver of his right to be free from compelled self-incrimination, he was not so compelled here. We have no question of a waiver of his rights against attempted compulsion, because there was not a shadow of compulsion at the time Bernett blurted out his first statement. This is to be contrasted with the statement he later made while in police custody and in response to police questioning, which the trial court suppressed, an action whose supporting rationale is clearly derived from *Miranda*[2] and related cases.

With regard to the trial court's action in the suppression hearing, the defendant complains on this appeal that the District Judge's inquiry re the first statement stopped short with his conclusion that the situation was non-custodial, accordingly that *Miranda* warnings were not required, and that he gave almost no consideration to the question of

1. 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L. Ed.2d 653 (1964) (emphasis supplied).

2. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

"voluntariness" aside from its *Miranda* aspect. We think there were very good reasons for the District Judge so conducting his inquiry. The legal question raised by the defendant at the suppression hearing (and on this appeal) was couched in terms of "voluntariness"—voluntariness in the constitutional principle sense as enunciated in *Miranda* and related cases. These decisions treat of "voluntariness" as an *absence of compulsion,* as we shall see both from the factual settings and the language of the opinions discussed fully later. This is why these cases arose as Fifth or Fourteenth Amendment questions; the compulsion forbidden therein is compulsion by the State, the voluntariness of the admission or confession required is the absence of State compulsion. The trial court satisfied itself of the absence of State (or any other) compulsion—there was never any custody—and thus resolved the only *constitutional* claim put forward by the defendant.

### B. *Due Process*

Another line of argument would suggest that the statement was potentially excludable, and therefore a basis for requiring resolution of the drunkenness issue, as a matter of due process, rather than self-incrimination. Although it is possible that admission of certain highly unreliable evidence with great potential for prejudice could be a violation of fundamental fairness, there was absolutely no indication that Bernett's statement was in fact unreliable, or that his condition rendered it so. Statements made by intoxicated persons are not *per se* unreliable.[3] Here the defendant not only volunteered the statement he had killed a man, but gave the exact street address where he had done so. The normal rules of evidence on competence and prejudice provide a sufficient safeguard with respect to the admission or exclusion of this type evidence, and the trial judge correctly applied them here. It is hard to see how

concepts of fairness founded in reliability could lead to a constitutionally based exclusion of what well could have been the very best evidence of what took place.

Finally, one strand of the "due process" argument might suggest that it is just too unfair to "take advantage" of one in appellant's condition. Keeping in mind that there was absolutely no element of state questioning or coercion, that rationale would soon lead to the conclusion that "the criminal has blundered badly, so he must go free."

The question Bernett raised in the District Court, and is before us here, although he termed it "voluntariness" in order to bring his issue within the terminology of a constitutional issue, is really much broader than the constitutional question of voluntariness. The question raised by Bernett is really a question of trustworthiness, whether he was sober enough (or drunk enough) to be telling the truth.

Trustworthiness is not a constitutional question at all; it is the classical question for the jury, under adequate instructions of course, unless the evidence is so blatantly unreliable that it should be excluded on the grounds of competence or prejudice. Voluntariness *is* a constitutional question, but voluntariness is only one particular factor which analytically is included in the broader concept of trustworthiness. What the defendant seems to be urging here is an expansion of the constitutional underpinnings of voluntariness to a breadth sufficient to support a *constitutional* challenge to any ruling on evidence relating to any element bearing on its *trustworthiness.* This vastly broader constitutional issue the decided cases—in language and in factual situation—definitely do not support.

### III. *The Limits of Previous Precedent*

Although many of the cases in this area have involved very broad language, their facts and rationales do not support

---

3. *See* Mergner v. United States, 79 U.S.App. D.C. 373, 147 F.2d 572, cert. denied, 325 U. S. 850, 65 S.Ct. 1085, 89 L.Ed. 1971 (1945) ;

Bell v. United States, 60 U.S.App.D.C. 76, 77–78, 47 F.2d 438, 439–440 (1931).

the holding sought here, which would implicitly sever the concept of "voluntariness" from police custody, questioning, or coercion. Nor does the specially defined concept of "waiver" in these opinions apply in the circumstances here to invalidate the admissibility of Bernett's undeniably voluntary statement.

The landmark case of Jackson v. Denno[4] did establish the need for prior judicial inquiry on the "voluntariness" issue as well as the notion that admission of an improper confession cannot be harmless error. However, that case concerned confessions given after in-custody questioning by the police, with additional elements of pain and refused requests for water thrown in for good measure. The constitutional rights as to the confession itself which were established there clearly turned on the possible presence of *coercion*; and the case's discussion of possible effects of drugs on rationality went to the notion of knowing and voluntary *waiver* of the right to remain silent.

Similarly, Sims v. Georgia,[5] the source of the requirement that voluntariness must appear with "unmistakable clarity," contained some broad language but was decided in the context of confessions given while in the county jail. The court specifically noted that there was conflicting evidence regarding the voluntary nature of the confession. There was no such conflicting evidence in Bernett's case, *unless* the concept of voluntariness is divorced from the type of coercion implicit in custody with which the *Sims* Court was clearly concerned.

The most far-reaching language in this area, which purports to establish a requirement for a valid confession of "a rational intellect and a free will," stems

from Blackburn v. Alabama.[6] Again, the real import of that case must be analyzed against its factual background— nine hours of interrogation of a mental incompetent in a police-filled room. The Court found a violation of fundamental fairness when an agency of government "wrings a confession out of an accused against his will." The differences in circumstance and appropriate rationale in Bernett's case are so striking as to amount to another matter altogether.

The overriding importance of *coercion*, in either overt or subtle form, is again and again made clear by close analysis of the facts in cases which have excluded confessions or required clearer findings of "voluntariness." Townsend v. Sain[7] involved arrest, interrogation, withdrawal symptoms, and the administration of truth serum by a police physician. The holding in Haynes v. Washington[8] turned on the fact of a sixteen-hour incarceration accompanied by threats and promises by the police. United States v. Guaydacan[9] concerned a confession after questioning by a customs agent, who threatened to send the suspect's whole family to jail.

If we turn from outside coercion as the decisive factor, language in these cases which concerns the rationality of the suspect as an internal matter almost always goes to the validity of a purported *waiver* of the right not to answer police questions—the sort of "waiver" which was not present in Bernett's case, and, on the facts, could not have been, thus making its absence irrelevant. In *Guaydacan* the drugged state of the suspect became relevant as an argument against the validity of the *Miranda* warnings, which he had to be dragged up off the floor to receive. In United States v. Silva[10] the court ordered a hearing on the issue of whether

4. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

5. 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967).

6. 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960).

7. 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

8. 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).

9. 470 F.2d 1173 (9th Cir. 1972).

10. 418 F.2d 328 (2d Cir. 1969).

the defendant had been mentally competent to waive his Fifth Amendment privilege and confess.

Particularly because of the imprecision of the shorthand used in such cases, it is possible for the notions of uncoerced confession and voluntary waiver to blur together when the only fact distinguishing the suspect from Bernett is arrest or custody, for arrest and custody can both make proof of an uncoerced confession necessary and also set the stage for the existence of a waiver being possibly relevant.[11] Custody in and of itself is a form of compulsion—so the decision to confess in that context may involve the waiver of the right not to be compelled or coerced. The presumption that custody will to some degree operate to force cooperation just does not apply when cooperation is forthcoming *before* that fact, as is indubitably clear with Bernett.

Similarly, the existence of prior police questioning, and the focusing of suspicion, puts the suspect in a different position, more likely to be coerced in subtle ways and therefore more in need of protection against irrational waiver of the right not to be so coerced, from one on whom suspicion has not yet focused. In United States v. Robinson[12] this court held improperly obtained a confession to a private doctor where the confession was the "culmination" of a process which had begun with improper interrogation by the police (custody was also a factor because the suspect was a committed mental patient).

In Bernett's case, when Officer Schleig found out by his police radio that there had been a homicide at the address given by Bernett, and that there was a bulletin to bring Bernett in for questioning, the officer immediately pulled the car over to the curb and gave Bernett the *Miranda* warnings. Suspicion had then focused on Bernett; if there were to be a statement later admissible in evidence, it had to be a voluntary statement, *i. e.*, a knowing waiver of Bernett's rights in the situation which had by then developed.

There are several cases which, at first glance, appear to offer more support to the defendant's position than do those discussed above. In Eisen v. Picard[13] the court did discuss the admissibility of allegedly incompetent (as opposed to coerced) non-custodial inculpatory statements. The court said that "[in] view of the nature and importance of defendant's inculpatory statements and his prima facie claim of incompetence, we would look askance at their admission without reliable evidence indicating that they were in fact competent."[14] To the extent that this statement is relevant, it was pure dicta, for the court had noted that, since the holding concerned custodial statements to police, "we do not reach the issue of whether a standard of voluntariness is applicable to non-custodial statements."[15] Furthermore, it is quite possible to read the court's statement as concerned with the normal rule against admission of incompetent evidence—a rule which does not have constitutional significance *unless* the evidence admitted is shown to be so significant that its admission results in a denial of fundamental fairness. That might have been true in Eisen's case, but it certainly would not be so for Bernett.

On its face, the broad language of United States v. Robinson[16] would seem to buttress defendant's position. There we held inadmissible an inculpatory

---

11. For example, in Gilpin v. United States, 415 F.2d 638 (5th Cir. 1969), the court held inadmissible a first drunkenly blurted confession (and derivative subsequent statements) made while in police custody. However, it is not surprising that a right to clearly established "voluntariness" with regard to a decision to talk arises with the mere fact of custody.

12. 142 U.S.App.D.C. 43, 439 F.2d 553 (1970).

13. 452 F.2d 860 (1st Cir. 1971).

14. 452 F.2d at 865–866.

15. 452 F.2d at 863 n. 3.

16. 148 U.S.App.D.C. 140, 459 F.2d 1164 (1972).

phrase which slipped out in the defendant's pre-trial statement to the court. In the course of its discussion, this court said that a " 'confession must be . . . uninfluenced by . . . any extraneous disturbing cause which deprives him of his free will and volition.' " [17] Aside from the ambiguity of the word "extraneous," the potential import of this statement is necessarily modified by the fact that the "confession" was uttered while the defendant was not only in custody but also stood before the formal tribunal which would determine his guilt or innocence. In that context, the court's discussion can be read as recognizing that in the face of such a tribunal, the accused had a right to remain silent and that a waiver of that right could be established only by an affirmative showing of voluntariness and rationality. Although there was no external compulsion in *Robinson*, to extrapolate this case as establishing a right to silence, which must be knowingly and rationally waived *before either arrest or formal confrontation*, is to base the result on a case which clearly did not anticipate Bernett's situation.

Most nearly in point is the dicta of Gladden v. Unsworth.[18] Although the case actually turned on the admissibility of a written confession given to police, the court also addressed itself to oral inculpatory statements made right after the crime, when the defendant might have been in a "drunken stupor approaching mania." A preliminary judicial inquiry on that issue was said to be important because "voluntariness is not necessarily established by proving that the confession was spontaneous or by proving the absence of an improper purpose on the part of the questioning officers." [19] The "mania" test appears to be borrowed from a string of pre-*Miranda* cases which actually allowed the admission of confessions made after arrest, unless drunkenness amounted to a state the court would characterize as "mania." [20] Without quarreling with the result reached by the Ninth Circuit, it does not appear to us that the Supreme Court opinion in Townsend v. Sain, *supra*, requires the conclusion of *Gladden*. Certainly *Townsend* does not support the dicta of *Gladden*,[21] which offers no discussion of policy to support the novel rule set forth therein.

## IV. *Policy Behind the Constitutional Issues*

Since it is clear that the relevant case law does not support, much less require, the result contended for by the defendant, we turn to an analysis of general principles and policies. Even if it is assumed that a remand would produce a clear finding that Bernett was as drunk as one can be and still utter inculpatory statements, it remains unclear why those statements should be constitutionally inadmissible under either a self-incrimination or due process rationale.

The literal terms of the self-incrimination clause go to the right not to be *compelled* to be a witness against oneself. The natural reading of this clause implies that it covers external compulsion, since the framers' concern was

17. 148 U.S.App.D.C. at 144, 459 F.2d at 1168, *citing* 29 Am.Jur.2d Evidence § 543 (1970).

18. 396 F.2d 373 (9th Cir. 1968).

19. 396 F.2d at 380.

20. *See* Mergner v. United States, 79 U.S. App.D.C. 373, 147 F.2d 572, cert. denied, 325 U.S. 850, 65 S.Ct. 1085, 89 L.Ed. 1971 (1945).

21. It is true that in *Townsend* it was said that a confession which is not "the product of a rational intellect and a free will" is inadmissible. Townsend v. Sain, 372 U.S. 293, 307, 83 S.Ct. 745, 754 (1963). This statement, however, was made in the context of custody, police interrogation, and externally imposed coercion. Also, other remarks in the case strongly suggest that "rational intellect and free will" means simply the absence of governmental compulsion. For example, the Court said: "Any questioning by police officers which *in fact* produces a confession which is not the product of a free intellect renders that confession inadmissible." *Id.* at 308, 83 S.Ct. at 754.

with government inquisition.[22]  The Supreme Court has consistently made it plain that a goal of the involuntary confessions doctrine, which is founded on the Fifth Amendment privilege, is to deter governmental misconduct.  For example, the Court stated in Spano v. New York:

> The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness.  It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.[23]

Since there was no such police misconduct in Bernett's case, exclusion of his statement could not even serve its increasingly dubious role as a deterrent.

The various notions which make up the concept of due process and fundamental fairness also fail to require exclusion.  Without judicially adopting the rule "in vino veritas," we find no proof here establishing the contrary, i. e., no indication that Bernett's statement was unreliable or that his condition rendered it so.  While drink may lower caution as to truth in statements about others, it also lessens judgment as to self-protection concerning statements which strike closer to home.  In that sense, it is probably true that a drunkenly blurted confession fails to conform to some abstract notion of free will; but it is also true that self-condemnation is rarely "rational" even though uncoerced.

It could be said that, by allowing use of Bernett's statement, the law is "taking advantage" of a man who was not at his best; but the same is true every time any carelessly mislaid piece of inculpatory evidence is introduced.  Admission of this statement is no more prejudicial to Bernett's right to remain silent at trial than would be the introduction of a revolver with his name stamped on it which he had left at the scene.  Perhaps most importantly, exclusion of such statements would destroy the usefulness of the criminal's guilty and indiscreet candor in the process of law enforcement.  Of course such candor should not be coerced; but if it is offered up before the conscientious policeman can even reach for his *Miranda* warning form-card, the law cannot and should not look the other way.

## V.  *"Voluntariness" or "Trustworthiness" as a Non-Constitutional Issue*

As shown above, we think the issues here do not involve constitutional principles of self-incrimination or due process.  Rather, Bernett's drunkenness at the time of blurting out the damning words raises questions of competence, prejudice, or trustworthiness, nothing more.  Therefore, at worst, the trial court's handling of the matter could amount to (1) an abuse of discretion in ruling on the competence of Bernett as the utterer of the statement; (2) an abuse of discretion in weighing relevance against potential prejudice; or (3) a violation of the procedural requirements of 18 U.S.C § 3501.  Given the current trend towards allowing the introduction of nearly all evidence for whatever it is worth, it seems unlikely that Bernett could be held fatally incompetent when he could still speak intelligibly and give verified detail.  In any case, there is no need for either findings or clarity as to this issue.  The trial

22.  *See* Malloy v. Hogan, 378 U.S. 1, 7, 84 S. Ct. 1489, 1493, 12 L.Ed.2d 653 (1964): "[T]he American system of criminal prosecution is accusatorial, not inquisitorial, and . . . the Fifth Amendment privilege is its essential mainstay."

23.  360 U.S. 315, 320–321, 79 S.Ct. 1202, 1205, 3 L.Ed.2d 1265 (1959).  *See also,* Jackson v. Denno, 378 U.S. 368, 385–386, 84 S.Ct. 1774; Bator & Vorenberg, Arrest, Detention, Interrogation and the Right to Counsel, 66 Colum.L.Rev. 62, 73 (1966); Developments in the Law, Confessions, 79 Harv.L.Rev. 935, 973 (1966).

judge properly has great discretion in ruling on competence and, absent more of a showing of unreliability than is present here, his ruling should stand.

Likewise, the issue of just how drunk Bernett was has bearing on the trial court's discretionary balancing of the probative value of evidence against its likely prejudicial effect. Once again, all the signs point to reliability and any prejudice results from just that fact.

■ It is also conceivable that failure to resolve the drunkenness question violated the procedural requirements of 18 U.S.C. § 3501 (1970). That statute provides that "the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness." Since this provision was a Congressional attempt to *expand* the use of confessions, and because it self-consciously drew on established judicial language, it can be argued that the "voluntary" standard included therein goes solely to coercion, except as supplemented by notions of rational waiver after confrontation. A contrary reading appears, however, from the provisions of § 3501(d):

> Nothing contained in this section shall bar the admission in evidence of any confession made or given *voluntarily* by any person to any other person without interrogation by anyone, or at any time at which the person who made or gave such confession was not under arrest or other detention. (Emphasis added.)

This subsection *could* be read to imply that a confession *could* be held to have been involuntary even if given spontaneously, before custody, and without the normal sorts of coercion. On the other hand, this subsection can be read as a broad exception to the procedural requirements of § 3501, waiving the need for prior judicial determination as to pre-custody spontaneous statements. Given the background and purpose of the statute, the latter is what Congress meant, and we so hold.

Without attempting to explicate in full our reasons for holding there was no error on these last three points, it is sufficient to note that all of these issues on which drunkenness might be relevant raise only a spectre of error which contains no constitutional substance. To the ectoplasm of these possible trial court mistakes the harmless error rule would apply, so we reach a result here parallel to that in Judge Robinson's opinion (Part IV) on the issue of instructions.

The conviction is

Affirmed.

### On Appellant's Suggestion for Rehearing En Banc

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting en banc.

### ORDER

Appellant has filed a suggestion for rehearing *en banc.* On consideration thereof, it is

Ordered by the Court en banc that the suggestion for rehearing en banc is denied, a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure).

Statement of Circuit Judge LEVENTHAL, as to why he has voted to deny rehearing *en banc.*

Chief Judge BAZELON and Circuit Judges J. SKELLY WRIGHT and SPOTTSWOOD W. ROBINSON, III would grant rehearing *en banc,* limited to the voluntariness issue discussed in Part III of Judge ROBINSON'S opinion in this case.

### STATEMENT OF CIRCUIT JUDGE LEVENTHAL AS TO WHY HE HAS VOTED TO DENY REHEARING EN BANC

1. Although I am voting to deny rehearing en banc, I have doubts concerning that part of Judge Wilkey's opinion for the panel which states that a constitutional challenge against receipt in evidence of an admission to the police for lack of voluntariness is conclusively

doomed where, as here, the setting was non-custodial and the officer's inquiry was not coercive.

Here there was no misconduct whatever on the part of the police, but the constitutional challenge does not necessarily require this. The verbal formulae differ somewhat from case to case, but the precedents converge in rejecting the notion that minimum fairness is satisfied, and that is the underpinning of due process, when a conviction is based upon the receipt in evidence of an admission made to the police under circumstances when the defendant lacked any significant measure of free will. *See* Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960): "[T]he evidence indisputably establishes the strongest probability that Blackburn was insane and incompetent at the time he allegedly confessed. Surely in the present stage of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane." 361 U.S. at 207, 80 S. Ct. at 280. Would Chief Justice Warren's premise of outrage be removed if the hapless incompetent confessed to the police in a non-custodial setting or in answer to a generalized question? Later, the Court expressly said it was "not significant" that questions by the police may have been asked by persons unfamiliar with hyoscine's properties as a

"truth serum." Townsend v. Sain, 372 U.S. 293, 307–309, 83 S.Ct. 745, 9 L.Ed. 2d 770 (1963). In Pea v. United States, 130 U.S.App.D.C. 66, 71, 397 F.2d 627, 632 (1968) we said: "It must be shown that in fact the confessor had a free will and intellect whether or not the detective had any reason to doubt its presence or suspect its absence."

As to drunkenness as a condition that may negative voluntariness, there is a difference in degree that is significant (see point 3), but not a difference in kind,[1] as appears from Gladden v. Unsworth, 396 F.2d 373 (9th Cir. 1968), the case of "a drunken stupor approaching mania." (p. 380). And the ruling in Unsworth's case was a holding, not dictum.[2]

2. Judge Wilkey soundly points out the facts of the decided cases generally involved persons in some kind of custody or coercive-type police questioning.[3] Absence of custody (and of coercive-type questioning) is certainly relevant on the issue of voluntariness, indeed highly material, perhaps "well nigh conclusive." But is it absolutely conclusive?

Suppose a police officer puts a question of the kind put to a citizen generally in an investigation (see note 2) as distinguished from a focused suspect? Is his position completely irrelevant in causing people to respond? There may be a responsibility of government to

---

1. See Pea v. United States, 130 U.S.App.D.C. at 75, 397 F.2d at 636. Footnote 13 reads:
   In 1958 the U.S. Attorney for the District lectured police officers regarding suspect interrogation in a hospital, instructing the police to give advice of constitutional rights and stating further: "You must satisfy yourself that the man who is being questioned is not under sedation, is not drunk, that he hasn't been hit on the head —in other words, that he knows what he's doing and his action is a voluntary act." Reprinted in Hearings on H.R. 11477 et al. Before a Subcommittee of the Senate Committee on the Judiciary, 85th Cong., 2d Sess. 411 (1958).
   In *Pea* the court said that a condition of concussion, with a bullet lodged in a man's skull, was the "equivalent" of a truth drug "so far as effect on free will is concerned" 130 U.S. App.D.C. at 72, 397 F.2d at 633.

2. The ruling required a new trial unless the state established the voluntariness of a confession made by Unsworth in his cabin, some 15 minutes after the shooting, where there was no custody and "there was no testimony that deputies . . . asked Unsworth any questions." (p. 379). What was put to Unsworth was said by Walker, the owner of a nearby cafe, see p. 379: "Walker went over to the bed and asked Unsworth what was going on." The ruling required a new trial even if the defendant were found to have recovered sufficiently from his drunkenness at the time of his later statements to make them voluntary.

3. However, as appears from footnote 2, in Gladden v. Unsworth there was neither custody, questioning by the police, or any coercive-type questioning.

avoid using the words of someone who is hapless—including in the term government not only the police (*supra*, note 1), but also the prosecutor and the judge. The Supreme Court has consistently warned us to avoid looking for absolutes in determinations of voluntariness, and has consistently noted that the issue depends on an assessment of "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

It is one thing for a criminal to blunder by leaving behind a weapon or fingerprint. But as pointed out in *Pea*, a testimonial statement must be distinguished from inanimate evidence for it is presented in the case as "the unique evidentiary contribution of 'an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give.'"[4] For the police to receive, the prosecutor to offer, and the judge to receive, such testimony from a person without free will raises more questions than merely pouncing on a criminal's blunder.

3. However, this case on its facts is simply not a suitable vehicle for exploration of these issues. As Judge Wilkey's opinion points out, in concluding that in this case the trial court did not abuse his discretion, "it seems unlikely that Bernett could be held fatally incompetent when he could still speak intelligibly and give verified detail." (at 971). In saying that exclusion is not required by concepts of fundamental fairness the panel noted there was "no indication that Bernett's statement was unreliable or that his condition rendered it so."

Even my reservations as to a constitutional claim assume some kind of government involvement at the time of the statement (though not necessarily coercive questioning). Whatever limitations are placed by the Constitution they are at lowest ebb in the case of a spontaneous exclamation, for example to a crowd that happened to include a detective, or even a policeman, unbeknownst to the declarant. This is not that case, but it is close; the police only asked, What's your name?

While the trial judge's approach seems to have been focused on the presence or absence of custody because of the *Miranda* portion of the challenge of defense counsel, his failure to focus expressly on the voluntariness issue apparently reflects a view that the facts of this case, taking the limited condition of drunkenness together with the absence of custodial restraint, did not raise a substantial question of voluntariness. While "unmistakable clarity" is contemplated by Sims v. Georgia, 385 U.S. 538, 544, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967), that was in a setting of disputed trial testimony, and even so the Court refrained from requiring formal findings of fact.

In the case of a condition as widespread as drunkenness, there is room for a high threshold. Many people who are very drunk indeed retain sufficient voluntariness for basic volitional capacity,[5] even though they have suffered some impairment, and it does not shock the conscience to repeat what they say any more than to convict them for crimes requiring only "general intent," a commonplace of our legal system.

I take the present case as one where the court is affirming a ruling by the trial judge that, on the particular facts, including the defendant's condition, the innocuous police question and absence of custody, there was no substantial doubt as to voluntariness.

4. See *Pea*, cited *supra*, note 1, 130 U.S.App. D.C. at 73, 397 F.2d at 634, quoting from Smith and Bowden v. United States, 117 U.S. App.D.C., 1, 3, 324 F.2d 879, 881 (1963).

5. A person's actions or statements may be adequate to avoid a constitutional claim of unfairness in the use of statements that were not "voluntary," even though they did not rise to the level of intentional relinquishment of a known legal right required for waiver. Schneckloth v. Bustamonte, 412 U.S. 218, 238 n. 25, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).